UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :

THE TOPPS COMPANY, INC.,          :

                               :

                  Plaintiff,     :

                               :           99 Civ. 9437 (CSH)

       - against -           :

                               :    MEMORANDUM, OPINION
                               :         AND ORDER

CADBURY STANI S.A.I.C. f/k/a   :
PRODUCTOS STANI SOCIEDAD   :
ANONIMA INDUSTRIAL Y      :
COMMERCIAL,               :

                               :

                  Defendant.    :

                               :
-------------------------------------------------------------x

HAIGHT, Senior District Judge:

     This diversity case is before the Court on the motion of defendant Cadbury Stani S.A.I.C.[1] ("Stani") for partial summary judgment on the claims and prayed-for damages of plaintiff The Topps Company, Inc.[2] ("Topps").[3] The rights and obligations of the parties are governed by New York substantive law pursuant to a forum selection clause in the 1980 contract between them. Ebert Aff., Exhibit A, ¶ 31.

## I. BACKGROUND

     In October 1957, Stani and Topps – at that time, two family owned enterprises – entered into a licensing contract whereby Topps granted Stani the exclusive right to "manufacture, sell, and distribute chewing gum under the Topps brands" in Argentina, Bolivia, Chile, Paraguay and

---

[1] Cadbury Stani S.A.I.C. is a corporation organized and existing under the laws of the Argentine Republic with its principal place of business in the Argentine Republic.

[2] The Topps Company, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of New York.

[3] Diversity jurisdiction is adequately pled as an action "between . . . (2) citizens of a State and citizens of subjects of a foreign state" and the amount in controversy exceeds $75,000. 28 U.S.C. §1332(a)(2).

Uruguay (collectively "the Territory"). 1957 License Agreement, *in* Orr Aff., Ex. A, ¶¶ 1, 7 (hereinafter the "Original License Agreement"). Topps agreed to share with Stani "the know-how, formulae, processes and techniques (hereinafter collectively called Topps processes) used by Topps." *Id.* In return, Stani agreed to pay Topps royalties based on the sales of the licensed products. *Id.* at ¶¶ 8-10. The Original License Agreement, which provided for an expiration date in October 1977, was signed by Joseph Shorin, at that time the President of Topps, and by Arnoldo Stanislavsky, president of Stani (and notarized by Edward Shorin, Joseph's brother, and future contract signatory and vice president of Topps). *Id.* at ¶ 13.

In 1976, the parties signed a second Licensing Agreement (the "1976 Agreement") in which they expressed a mutual desire to continue their licensing relationship. *See* 1976 Agreement, *in* Orr Aff., Ex. B. The 1976 Agreement was expressly replaced and superceded in 1980 by the Amended and Restated License Agreement (the "1980 Agreement"). *See* 1980 Agreement, *in* Orr Aff., Ex. C.

The 1980 Agreement reiterated the basic arrangement: Topps agreed to provide Stani with an exclusive license to manufacture and sell a group of Topps licensed products in the Territory in return for royalty payments. Furthermore, Topps agreed to provide Stani with the "Topps Technology" necessary to that end. Because what constitutes Topps Technology is central to this dispute, I recite the capacious contractual definition in full:

> (1) . . . (a) "Topps Technology" means the specialized knowledge and experience of Topps applicable to the manufacture and/or sale of Licensed Products, such as (but not limited to):
> (i) <u>manufacturing technology</u> consisting of formulae, recipes, processes, equipment utilization, labour and equipment standards, ingredient specifications, factory management and production planning techniques, factory facility design and layout and quality control procedures, including gum base technology, and
> (ii) <u>marketing technology</u> consisting of finished product design, packaging material design and specifications, promotional and advertising techniques, marketing techniques and sales force management techniques,

(iii) all other elements of Topps' knowledge and experience in the confectionary industry applicable to Licensed Products currently being produced by Topps or future products produced by Topps.

1980 Agreement, ¶1(a) *in* Orr Aff., Ex. D.

The 1980 Agreement – signed by Stanislavsky, Stani's president, and Edward Shorin, Topps' vice president – further provided that Topps Trademarks and Technology remained the exclusive property of Topps and obligated Stani "not to disclose to third parties any information relating directly or indirectly to the Topps Technology." *Id.* at ¶¶ 3, 12, 27. In consideration of the license and rights granted to Stani, it agreed to pay Topps a license fee, or royalty payment, of 3% of the annual net sales of the licensed products. *Id.* at ¶ 20. The 1980 Agreement also gave Topps the right to inspect the manufacturing process of licensed products and required Stani to provide Topps with regular license fee statements to enable Topps to "confirm[] the accuracy of license fee calculation[s]." *Id.* at ¶ 21. Topps also maintained the right to inspect Stani's "books of account" relating to Stani's sales of the licensed products. *Id.* at ¶23. Upon expiration of the 1980 Agreement in April 1996, Stani's right to employ Topps Trademarks and Technology would cease. *Id.* at ¶¶ 6, 25(b)(ii). .

In January 1985, Stanislavsky wrote a letter to Arthur Shorin, Topps' president, in which he suggested that the parties "reconsider[] some aspects of our business relationship." Orr Aff., Ex. D, at 1. Stanislavsky observed that while the original arrangement provided for royalties to be paid on all products Topps licensed to Stani, due to changes in the consumer market, the state of technology, and Stani's sales "the sole consideration has become the use of the trademark Bazooka [chewing gum]," which accounted for 75% of Stani's "turnover in gum." *Id.* In other words, Stani contended that because it was no longer relying on Topps Technology, Stani's payment of royalties to Topps for the sales of its non-Bazooka licensed products was putting

those non-Bazooka products at a competitive disadvantage. *Id.* The primary non-Bazooka licensed product was a chewing gum called Beldent.

As a result of Stanislavsky's January 1985 letter, in May 1985 the parties entered into an Amendment to Amended and Restated License Agreement (the "1985 Amendment"). 1985 Amendment, *in* Orr Aff., Ex. E. The 1985 Amendment was signed by Arthur Shorin and Stanislavsky. *Id.* at 4. Noting that "Topps and Stani attribute the durable quality of the[ir] association to the willingness of the parties to alter contract terms and conditions in order to reflect changed circumstances," the parties amended the 1980 Agreement to address Stanislavsky's concerns, as expressed in his January letter, that Beldent and other non-bazooka products were at a competitive disadvantage because of the royalty payments. *Id.* at 1. First, the 1985 Amendment excluded all non-Bazooka products from license fee calculations once the total license fees on those products reached $350,000. *Id.* at ¶ 4. The 1985 Amendment also provided that "[a]ll other terms and conditions of the [1980] Agreement not specifically altered by this Amending Agreement are to remain unchanged." *Id.* at ¶ 8.

Precisely what event or events precipitated the deterioration of the parties' relationship is not clear, though it appears to be related to the 1993 acquisition of Stani by Cadbury Schweppes, PLC. On or about November 18, 1993, Cadbury Schweppes purchased a majority interest in Stani. Fourth Amd. Compl., ¶ 4. According to Topps, both during the course of and after this transaction, Stani illicitly shared Topps Technology with Cadbury Schweppes, and then endeavored to conceal its misdeeds from Topps. *Id.* at ¶¶ 17-19.

Topps' Fourth Amended Complaint alleges five Claims.[4]

---

[4] On September 17, 2002 Topps filed its Fourth Amended Complaint. Subsequently, on February 4, 2003, the parties agreed to dismiss the complaint against Cadbury Schweppes (claims six and seven), leaving five claims against defendant Stani.

Topps' First Claim, for breach of contract, asserts that Stani breached the 1980 Agreement with Topps by (i) disclosing Topps Technology to Cadbury Schweppes during the due diligence phase of the Cadbury/Stani transaction, in contravention of ¶ 12; (ii) continuing to use Topps Technology after the expiration of the agreement, in contravention of ¶ 25(b)(i); and (iii) disclosing Topps Technology to Cadbury after the expiration of the agreement, in contravention of ¶¶ 3, 12, and 25(b)(i). Topps demands damages exceeding $250 million and disgorgement of Stani's profits.

Topps' Second Claim, for misappropriation of trade secrets, is based upon Topps' assertions that through, *inter alia*, "reverse engineering," Stani misappropriated Topps Technology in violation of both the agreement and the parties' confidential relationship. Stani is also alleged to have used and disclosed the technology to Cadbury both before and after the expiration of the agreement, and then deliberately concealed the use and disclosure from Topps. Topps demands damages exceeding $250 million and disgorgement of Stani's profits.

Topps Third Claim is a prayer for injunctive relief in the form of a permanent injunction against the future use and dissemination of Topps Technology by Stani.

Topps' Fourth Claim, for fraudulent inducement, is grounded in the representations made in Stanislavsky's January 1985 letter – now alleged by Topps to be false – regarding the sources of Stani's gum manufacturing technology and the percentage of its net sales attributed to Bazooka. Specifically, Stani's letter stated that they were no longer using Topps Technology in the production of Beldent and all other non-Bazooka gum products, and that those non-Bazooka products accounted for less than 25% of Stani's net sales. Topps claims that these fraudulent representations induced Topps to agree to the 1985 Amendment. Topps requests judgment (i) declaring the Amendment a nullity, and (ii) estopping Stani from claiming that the 1985

Amendment altered the Agreement allowing Stani to use Topps Technology after the 1996 expiration of the Agreement. Topps also includes an estoppel demand in its Fourth Claim, endeavoring to preclude Stani from arguing that the 1985 Amendment altered the 1980 Agreement.

Because the 1985 Amendment terminated royalties on non-Bazooka products (primarily Beldent) after such royalty payments reached $350,000, Topps' Fifth Claim prays for lost royalties for the period between 1987, when the aggregate royalty payments reached the $350,000 threshold, and 1996, when the Agreement expired.

Topps also requests punitive damages, interest, and costs.

Following extensive discovery, Stani now moves for partial summary judgment on Topps' Fourth and Fifth Claims and seeks to limit damages.

First, Stani claims that Topps' Fourth and Fifth Claims are time barred because they were not filed within the applicable statute of limitations period, which in New York is within six years from the accrual of the cause of action or two years from the time the plaintiff discovered the fraud or should have discovered it. Stani claims, first, that Topps had actual knowledge of the alleged fraud – fraud which Stani denies occurred – more than two years prior to the date on which Topps filed its fraudulent inducement claim. Alternatively, Stani contends that even if Topps did not have actual knowledge of the fraud, Topps by the exercise of reasonable diligence could have discovered the fraud more than two years prior to its filing of this suit. In other words, Stani contends that Topps had either actual or constructive knowledge of Stani's allegedly-fraudulent representations more than two years before Topps' inclusion of its fraudulent inducement claim in this action.

Second, Stani claims that punitive damages are not available to Topps on any claim. Under New York law, according to Stani, a prerequisite for the award of punitive damages arising out of a contractual relationship is that defendant engage in a pattern of activity directed against the general public ("public harm"). Because Topps fails to allege that Stani committed a public harm, punitive damages are not available. Moreover, Stani claims that Topps cannot demonstrate that Stani's management possessed the requisite level of egregiousness that would warrant punitive damages.

Finally, Stani asserts that disgorgement is not an available remedy for Topps' First and Second claims (breach of contract and misappropriation). Emphasizing the overlapping nature of the two claims, Stani argues that disgorgement is not recoverable on Topps' breach of contract claim, and that disgorgement on the misappropriation claim would be unjust because Stani's own endeavors added value to the allegedly misappropriated trade secrets. Rather, Stani contends, the Court should apply the "reasonable royalty" damage measure, which Stani contends is the 3% of net profits agreed upon in the 1980 Agreement.

Topps resists all aspects of Stani's motion. After the parties submitted extensive briefs and voluminous evidentiary material, the Court heard oral argument from counsel.

## II. DISCUSSION

For the reasons that follow, I deny defendant's Motion for Partial Summary Judgment in part and grant it in part.

Specifically, (i) I deny summary judgment on Topps' Fourth and Fifth Claims insofar as Topps' claim is not obviously time-barred; (ii) I grant summary judgment on Topps' Fourth Claim insofar as it seeks that Stani be estopped from claiming that the 1985 Amendment altered the 1980 Agreement; (iii) I deny summary judgment on the issue of punitive damages relating to

Topps' misappropriation claim; (iv) I grant summary judgment on the issue of punitive damages relating to Topps' breach of contract and fraudulent inducement claims; (v) I deny summary judgment on the issue of disgorgement of Stani's profits for misappropriation of trade secrets; and (vi) I grant summary judgment on the issue of disgorgement of Stani's profits on Topps' breach of contract claim.

## A. Standard of Review on Motion for Summary Judgment Pursuant to Rule 56

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060-61 (2d Cir. 1995). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In the case at bar, the parties selected New York law to govern the case pursuant to a forum selection clause in the 1980 contract between the parties. Ebert Aff., Exhibit A, ¶ 31, p. 27.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v.. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If there is "any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-

moving party," then summary judgment should be denied. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d. Cir. 1994).

## B. Statute of Limitations

Under New York law, actions based on fraud must be commenced within "six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. 213(8) (Consol. 2004) (effective Aug. 17, 2004).[5] In the case at bar, Topps alleges that Stani fraudulently induced Topps to enter into the Amendment through representations made in a letter dated January 17, 1985. The Amendment was actually consummated on May 1, 1985, and consideration paid immediately when Topps allowed Stani to continue to use "Topps Technology." Orr Aff., Ex. E; Fourth Amended Compl. ¶ 42. Topps filed its initial complaint in this action on September 24, 1999 and filed its Third Amended Complaint, the first complaint containing its fraudulent inducement claims, on February 4, 2002.[6] Hence, there is no dispute that plaintiff's action was not filed within six years of the accrual of the action. The crux of the dispute, then, is whether Topps had actual or constructive notice of the alleged fraud more than two years prior to stating its fraudulent inducement claim.

---

[5] The August 2004 Amendment to CPLR 213(8) does not change the substance of the law regarding the statutory period for a fraud claim. Prior to the amendment, Courts interpreting New York law read two sections of the CPLR in conjunction with each other. Section 213(8) provided for a six year statute of limitations for fraud accruing from the actual or constructive discovery of the fraud. However, the language of 213(8) was modified by Section 203(g) which provided for a two year statutory period from actual or constructive discovery of the underlying facts. Hence, prior to the 2004 Amendments, "[t]hese two sections taken together [were] interpreted to mean that fraud actions must be commenced within six years from commission of the fraud or two years from discovery, whichever is longer." *Rickel v. Levy,* 370 F. Supp. 751, 755-56 (E.D.N.Y. 1974); *see also Phillips v. Levie,* 593 F.2d 459, 462 (2d Cir. 1979); *Rutland House Associates v. Danoff,* 325 N.Y.S.2d 273 (1st Dept. 1971).

[6] Whether the fraudulent inducement claim relates back to the original complaint is irrelevant here, because both the original Complaint and the Third Amended Complaint fall well outside of six years from the accrual of this action. *See* Fed. R. Civ. P. 15(c) ("Relation Back Amendments – An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading.").

While there is significant evidence to indicate that Topps knew of the alleged falsity of the facts proffered by Stani, or at least should reasonably have known of their falsity, on this motion for partial summary judgment I am required to resolve all ambiguities and draw all inferences against Stani as the moving party. Having done so, I conclude that the evidence is insufficient to entitle Stani to a summary disposition of these issues.

1. Actual Knowledge

The parties dispute whether Topps had actual knowledge of Stani's alleged fraud more than two years prior to the filing of this claim. Both parties selectively excerpt the deposition of Arthur Shorin – Topps CEO and Chairman – to substantiate their positions. According to Topps, Shorin believed the representations made by Stani in the 1985 letter, specifically that Stani was no longer using Topps Technology in the production of Beldent, and that Beldent sales comprised less than 25% of Stani's net gum sales. *See, e.g.,* Ebert Aff. ¶ 22. In contrast, Stani points to Shorin's statements in which he suggests that Stani could not manufacture chewing gum without employing Topps Technology. *See, e.g.,* Defendant's Memorandum of Law, p. 8.

There is a significant dispute between the parties as to what constitutes "Topps Technology," whose contractual definition, quoted in Part I, encompasses an extremely broad range of activities and products. Stani asserts that if one accepts Topps' own conception of what constitutes Topps Technology – a definition which Stani calls "wholly unrealistic and unreasonably broad" and "overblown," Defendant's Supplemental Submission, p. 5, – it necessarily follows that Topps knew Stani was employing Topps Technology. In that regard Stani points to the deposition testimony of Topps' Chairman and CEO that "any manufacturer of any chewing gum product was, you know, employing our technology." A. Shorin Dep. Tr. at 313 *in* Defendant's Supplemental Memorandum at 7. Stani also points to evidence that Topps

executives knew about Stani's continued use of dusting sugar and mechanisms for reclaiming gum "scrap,"[7] both alleged to be Topps Technologies. *Id.* at 10-11.

No doubt, by 1985 the fruits of twenty-eight years of Topps' technical assistance to Stani were integrated throughout Stani's gum manufacturing operations. This was known to Topps. It had to be. However, the extent to which Topps Technology was still being surreptitiously employed by Stani in its production of Beldent, and the extent to which Topps had actual knowledge of such use, are disputed issues of material fact. There can be no doubt that Topps knew that Stani continued to use certain areas of Topps' "specialized knowledge and experience" such as "factory facility design and layout" and "equipment utilization," as well as some "other elements of Topps' knowledge and experience in the confectionary industry" after the expiration of the agreement. *See* 1980 Agreement, ¶1(a) *in* Orr Aff., Ex. D. However, the fact that Topps knew that some of its then-twenty-eight years of technical assistance was still being employed by Stani does not prevent Topps from claiming, as it does, that Topps was fraudulently induced into the 1985 Amendment through intentional misrepresentations about Stani's use of other aspects of Topps Technology, including the gum base and softener formulas used in Beldent, and through misrepresentations contained in Stan's inaccurate financial reports.

In sum, determining what constitutes Topps Technology is a fact-intensive inquiry, best left to the fact finder after both parties have been afforded the opportunity to present their evidence. After the fact finder agrees what proprietary information constitutes Topps Technology, it can proceed to determine whether Topps had actual knowledge of its allegedly-improper use by Stani, such that Topps' Fourth and Fifth Claims are barred by the statute of limitations.

---

[7] Reclaiming gum scrap increases the efficiency of gum production by minimizing the amount of product wasted during the manufacturing process. Tr. 34.

## 2. Constructive Knowledge

The conclusion just reached in Part I.B.1. concerning Topps' actual knowledge does not resolve the time bar issue. For the purpose of determining when the statute of limitations begins to run, the absence of conclusive evidence of *actual* knowledge is only the beginning of the inquiry, since the statutory period does not await "the leisurely discovery of the full details of the alleged scheme." *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970). Knowledge will be imputed to a plaintiff claiming fraud if, with reasonable diligence, plaintiff *could have* discovered the fraud prior to its actual discovery. N.Y. C.P.L.R. 213(g). The test employed by the courts to determine whether the fraud should have been discovered is an objective one. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *Lenz v. Associated Inns and Restaurants Company of America*, 833 F. Supp. 362, 370 (S.D.N.Y.1993); *Sielcken-Schwarz v. American Factors*, 265 N.Y. 239, (1934) ("Where there is knowledge of facts sufficient 'to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises,' and may thus start the running of the statute.") (quoting *Higgins v. Crouse*, 147 N. Y. 411, 416 (1895)).

There is no general rule as to the number or nature of facts which should trigger such an investigation. Rather, each case presents a universe of unique facts which must be evaluated in order to determine whether the alleged fraud should have been discovered. *Lenz,* 833 F. Supp. at 370. "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case . . . ." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979). Consequently, a defendant seeking summary judgment based on plaintiff's failure to timely discover fraud faces considerable hurdles,[8] since the moving party bears the burden of

---

[8] Courts have labeled such a defendant's burden as "onerous," *Menke v. Glass*, 898 F.Supp. 227, 233 (S.D.N.Y.1995), and "extraordinary," *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F.Supp. 743, 756 (S.D.N.Y. 1994), *aff'd in part, rev'd in part on other grounds,* 65 F.3d 1044 (2d Cir. 1995).

demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

Because the objective test for constructive knowledge of fraud requires an intensive and fact-specific factual inquiry, the Second Circuit has held that it "ordinarily should not be disposed of by summary disposition." *Schmidt v. McKay,* 555 F.2d 30, 37 (2d Cir. 1977), and went on to say:

> This inquiry has been described as a mixed question of law and fact . . . . Since such an inquiry necessarily involves a dispute concerning state of mind and conflicting interpretations of perceived events, summary judgment is ordinarily not a proper vehicle for the resolution of such a dispute.

*Id*. (citations and quotations omitted). "[T]he better practice is to allow the defense to stand until trial." *Mahfouz v. Mahfouz*, 24 A.D.2d 988 (2d Dep't 1965); *see also Menke v. Glass*, 898 F. Supp. 227, 233 (S.D.N.Y. 1995) (holding that *"*the determination of whether a plaintiff has exercised sufficient diligence is normally a question of fact for the jury to decide"); *In re Integrated Resources Real Estate Ltd. Partnerships Securities Litigation*, 815 F.Supp. 620, 638 (S.D.N.Y. 1993) (same).

However, I do not mean to suggest that summary judgment would never be appropriate on the issue of constructive knowledge. "[I]n particularly clear cases summary judgment may be granted." *Rickel v. Levy*, 370 F. Supp. 751, 756 (E.D.N.Y. 1974). *See, e.g., Ferber v. Ehrlich*, 1994 WL 132168, at *7 (S.D.N.Y. Apr. 14, 1994) (granting motion to dismiss where plaintiff failed to receive promised distributions from investments, did receive contrary I.R.S. information about the status of his investments, and his requests for an explanation were repeatedly rebuffed by defendant); *Lenz*, 833 F. Supp. at 374 (granting summary judgment where "undisputed facts" showed that plaintiff was aware of continuing material inconsistencies between defendant's oral representations and written statements and agreements, the plummeting value of the investment,

and defendant's prior fraud conviction); *Buckler v. Marvel Entertainment Group, Inc.*, 1992 WL 210101, at *3 (S.D.N.Y. Apr. 17, 1992) (granting summary judgment where plaintiff acknowledged failing to read the terms of his contract); *Nusca v. Fodera*, 514 N.Y.S.2d 65 (2d Dep't 1987) (granting summary judgment where plaintiff did not receive 25% of corporation's stock promised him in exchange for real property, yet waited twelve years after the promised stock was due to file suit). But the case at bar is of a quite different nature.

Both parties nimbly shear snippets from various depositions to support their claims that Topps had reason, or did not have reason, to know of Stani's alleged fraud. Such excerpts, however, are insufficient to demonstrate that there is no genuine issue of material fact concerning whether constructive knowledge should be imputed to Topps. At the time of the 1985 Amendment, Topps and Stani were in the midst of a twenty-eight year business relationship. Defendant's Rule 56.1 Statement ¶¶ 3, 4. There is nothing in the record which indicates that between 1957 and 1985 the long-standing relationship between these formerly family-owned corporations was anything but amicable, or, to state the proposition more precisely, that Topps had reason to suspect that Stani was acting fraudulently.

Defendant contends that because Topps' executives had access to Stani plants and financial paperwork in 1985, Topps should have discovered the alleged fraud earlier.[9] Topps responds that Topps' executives believed Stani's representations, and only discovered the alleged fraud during discovery in 2001. Specifically, during the hearing, counsel for Topps was asked by the Court, "[w]hat was it, Mr. Ebert, that first carried to your client's nostrils the faint whiff of fraud?" Tr. 66. Ebert, Topps' attorney, responded that the whiff was carried by a

---

[9] At the hearing on this motion, counsel for Stani made much of the fact that Topps had access to Stani's plants and financial records which would belie the claims made in Stani's 1985 letter. However, whether or not Topps had access to this information merely begs the question of whether Topps had reason to suspect fraud, and, if so, whether Topps' actual inquiry was sufficient under the circumstances.

document, produced during discovery in 2001, which showed that Stani had done nothing to alter the gum base and softener formulas used in Beldent. Tr. 67. According to Topps, it was only when the present Beldent formulae were compared with the formulae used in Beldent in 1985, that Topps became aware that Stani allegedly used fraudulent misrepresentations to induce Topps into the 1985 Amendment. According to Topps, until this discovery, it had no reason to suspect fraud.

Through development of the facts at trial, the fact finder will be better able to determine whether the totality of the circumstances were sufficient to trigger an investigation, and if so, whether the investigation Topps actually embarked upon was adequate. Because this inquiry involves disputes over state of mind and conflicting interpretations of perceived events, summary judgment is not a proper vehicle for its resolution, and therefore I deny defendant's motion for summary judgment as to Topps' Fourth and Fifth Claims.

3. Estoppel

Within its Fourth Claim for relief, Topps includes a section entitled "Stani's Erroneous Post-Litigation Construction of the [1985] Amendment." Fourth Amended Compl., at p. 9. Therein, Topps contends that Stani's interpretation of the 1985 Amendment to the 1980 Agreement is flawed and, as a result, Topps demands that Stani be "estopped and precluded from contending that it was relieved of liability for using Topps Technology in its Beldent gum product after the expiration of the Agreement." *Id.* at ¶ 51. Stani moves for summary judgment on Topps' estoppel demand, contending that there is no colorable justification for estopping Stani from asserting this argument. I agree.

Whether, and to what extent, the 1985 Amendment altered the 1980 Agreement are issues of fact for the jury. I am unable to discern, and Topps has not offered, any reason why

this issue should be adjudicated in any other manner. The doctrine of judicial estoppel "applies only in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir.. 2005) (citing *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir. 2004)). Because neither of those factors are present here, I grant Stani's motion for summary judgment on Topps' demand that Stani be estopped from claiming that the 1985 Amendment otherwise altered the 1980 Agreement.

## C. Punitive Damages

Topps' lawsuit rests on three causes of action: (i) breach of contract (First Claim); (ii) fraudulent inducement (Fourth Claim); and (iii) trade secret misappropriation (Second Claim).[10] For the reasons that follow, I hold that punitive damages are not available to Topps, as a matter of law, on its breach of contract and fraudulent inducement claims, though such damages may be available on its misappropriation of trade secrets claim.

### 1. Breach of Contract (First Claim)

Damages for a breach of contract are normally limited to the amount necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract.[11] *See Wallace Steel, Inc. v. Ingersoll-Rand Co.*, 739 F.2d 112, 115 (2d

---

[10] Topps' Third Claim requests a permanent injunction against Stani from using or disseminating Topps Technology and its Fifth Claim is for lost royalties based on Stani's alleged fraudulent representations which induced Topps into the 1985 Amendment.

[11] Compensatory damages have also been described as representing three different interests of the non-breaching party. L.L. Fuller & William R. Perdue, *The Reliance Interest in Contract Damages* (Pts. 1 & 2), 46 YALE L.J. 52 (1936). First, restitution interest represents any benefit which the non-breaching party bestowed on the breaching party. Second, reliance interest represents any detriment which the non-breaching party suffered due to her reliance on the agreement. Third, expectation interest represents any gain which the non-breaching party would have realized from the contract but for its breach. Courts routinely award compensatory damages according to the non-breaching party's expectation interest. *See, e.g., J.R. Loftus, Inc. v. White*, 85 N.Y.2d 874, 877 (1995) (holding that the "general measure of damages

Cir. 1984). In contrast, the purpose of awarding punitive damages is not to make the plaintiff whole, but rather to punish the defendant and to deter future egregious conduct. *United States for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 160 (2d Cir. 1996). As a result, "[p]unitive damages are not recoverable for an ordinary breach of contract," *Rocanova v. Equitable Life Assurance Society of the U.S.,* 83 N.Y.2d 603, 613 (1994), because they would put the non-breaching party in a *better* financial position than they would have occupied but for the breach.[12] *See Aniero Concrete Co., Inc. v. New York City Const. Authority*, 2000 WL 863208, at *28 (S.D.N.Y. June 27, 2000) (Haight, J.); Restatement (Second) of Contracts § 356 cmt. a (1981) ("The central objective behind the system of contract remedies is compensatory, not punitive.").

Because they do not advance the objectives of the compensatory damages regime, punitive damages are rarely available for a breach of contract claim. They become available only when a defendant engages in conduct "aimed at the public generally" so that punitive damages become "necessary to vindicate public rights." *Rocanova,* 83 N.Y.2d at 613. Moreover, the misconduct must evince a "high degree of moral turpitude [demonstrating] such wanton dishonesty as to imply a criminal indifference to civil obligations." *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961); *Rocanova*, 83 N.Y.2d at 613; *see also New York Univ. v.*

---

for the plaintiff . . . is expectancy damages"); *Dickinson v. Hart*, 142 N.Y. 183, (1894) (same).

[12] In addition, awarding punitive damages for a simple breach of contract would deter breaches that the law endeavors to protect. *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir. 1985) (Friendly, J.) ("Breaches of contract that are in fact efficient and wealth-enhancing should be encouraged . . . . The addition of punitive damages to traditional contract remedies would prevent many such beneficial actions from being taken."). Underlying the compensatory damages rationale is a recognition that even deliberate breaches of contract are not necessarily blameworthy. *Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742, 750-51 (7th Cir. 1988) (Posner, J.). In fact, the law presumes that parties to contracts are rational: they chose to breach contracts because it is more efficient to breach and pay compensatory damages than to perform. If so, efficiency is promoted by allowing parties to break their promise, provided that they compensate the non-breaching party for actual losses. If a party is forced to pay more than that, for example through the imposition of punitive damages, an efficient breach may be deterred. *Id.*; *see also* 3 E. Farnsworth, *Contracts* § 12.8, at 194-95 (2d ed. 1990) ("Most courts have not infringed on the freedom to keep or break a contract traditionally afforded a party by the common law and endorsed by the notion of efficient breach.").

*Continental Ins. Co.,* 87 N.Y.2d 308, 316 (1995). These are known, respectively, as the "public wrong" and "extraordinary egregiousness" requirements.

A very recent Second Circuit decision, *TVT Records v. Def Jam Music Group*, 412 F.3d 82,(2d Cir. 2005), adheres to the New York Court of Appeals' decisions in *Rocanova* and *New York University* which required proof of a public wrong and extraordinary egregiousness to enable a punitive damages award for a simple breach of contract. In *TVT Records* the district court let stand a jury award of punitive damages in a breach of contract case because the court discerned in two earlier New York Appellate Division cases the theory that "punitive damages might be available on a contract claim, absent conduct directed at the public, where the plaintiff establishes a sufficiently high degree of bad faith by the defendant . . . " 412 F.3d at 94. That theory, the Second Circuit concluded in *TVT Records*, could not survive the New York Court of Appeals' subsequent decisions in *Rocanova* and *New York University*, which led the Second Circuit to observe that under New York law "punitive damages are recoverable in a contract action only if necessary to vindicate a public right. This rule has not been changed by the Court of Appeals, and we have no reason to question its continued vitality." *Id.* (ciations and internal quotation marks omitted). Hence, the Second Circuit set aside the award of punitive damages because "[w]e do not believe that [defendant's] conduct in breaching the [contract] was aimed at the public generally." *Id.* at 94-95.

Accordingly, in order to collect punitive damages for its breach of contract claim Topps must first adduce evidence that Stani's conduct was part of a pattern directed at the public generally, *i.e.* a public wrong. For the purposes of identifying a public wrong, New York law distinguishes between "a gross and wanton fraud upon the public" and "an isolated transaction incident to an otherwise legitimate business." *Walker*, 10 N.Y.2d at 406; *see also TVT Records,*

2005 WL 1394140, at *10. The latter does not constitute conduct aimed at the public generally. *Id.* Even viewing the evidence in the light most favorable to Topps, no interpretation of the facts underlying the claim could support labeling Stani's conduct a gross and wanton fraud upon the public.[13] Topps alleges the quintessential private wrong and, as a matter of law, its breach of contract claim does not warrant punitive damages.[14]

## 2. Fraudulent Inducement (Fourth Claim)

In addition to eliminating punitive damages from simple breach of contract claims, New York law limits the availability of punitive damages for a tort claim which "arises from," *Rocanova*, 83 N.Y.2d at 613,[15] or "has its genesis in, " *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316 (1995), a contractual relationship.[16] *See also Schonfeld v. Hilliard,* 218 F.3d 164, 183-84 (2d Cir. 2000) (same). In *Rocanova*, the Court summarized the four pleading elements required to state a claim for punitive damages when the claim arises from a contractual relationship between the parties: (1) defendant's conduct must be actionable as an independent

---

[13] Moreover, I see absolutely no basis for carving out an exception for breaches of contract involving intellectual property, as plaintiff would have me do. Plaintiff's Supplemental Submission, at 4. In fact, the case upon which plaintiff relies, *TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 2d 188 (S.D.N.Y. 2003) was expressly overruled by the Circuit Court, in which it unequivocally supported the public wrong requirement, *TVT Records v. Island Def Jam Music Group,* 412 F.3d at 82.

[14] Because I find, as a matter of law, that Topps cannot demonstrate a public wrong, I do not reach the question of whether Stani's conduct rises to the requisite level of egregiousness.

[15] In *dicta*, the *Rocanova* court employs broad language implying that "conduct . . . accompanying, or associated with the breach of contract" would also be subject to proof of a public wrong and extraordinary egregiousness. 83 N.Y.2d at 613. This clearly would encompass a greater spectrum of conduct than does the "arises from" or "has its genesis in" language used by the same court one year later in *New York University*. Because the *New York University* decision is subsequent to *Rocanova*, and because the Second Circuit and this Court have invoked the *New York University* language, I treat the broad *Rocanova* language as simply *dicta*. Moreover, and perhaps more importantly, if any conduct "accompanying" a breach of contract was subject to the *Rocanova* elements, a plaintiff would be forced to show a public harm resulted from any claim which is proffered alongside a breach of contract claim. The act of entering into a contract could largely insulate tortfeasors from punitive damages.

[16] Because New York law draws no distinction between a claim that "arises from" a contractual relationship and a claim that "has its genesis in" such a relationship, and because I can discern no substantive difference, I use the terms interchangeably.

tort;[17] (2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon, supra*; (3) the egregious conduct must be directed at plaintiff; and (4) it must be part of a pattern directed at the public generally. 83 N.Y.2d at 613; *see also Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 2003 WL 22795650, at *9 (S.D.N.Y. Nov. 5, 2003); *New York Univ.*, 87 N.Y.2d at 316.

In contrast, under New York law a court may award punitive damages on a tort claim unrelated to a contractual relationship if plaintiff can simply demonstrate that the defendant committed "gross, wanton or willful fraud or other morally culpable conduct." *Borkowski v. Borkowski,* 39 N.Y.2d 982, 982 (1976). No showing of a public wrong is required. Neither need plaintiff demonstrate the degree of egregiousness (namely, wanton dishonesty implying a criminal indifference to civil obligations) necessary to recover punitive damages on a claim arising from a contractual relationship. Thus, punitive damages are more likely to be available on a tort claim that does not arise from a contractual relationship.

---

[17] When conduct giving rise to an action breaches a legal duty which exists "independent of contractual relations between the parties," such conduct may constitute an independent tort. *Channel Master Corp. v. Aluminium Limited Sales, Inc.*, 4 N.Y.2d 403, 408 (1958). In contrast, "[i]f the only interest at stake is that of holding the defendant to a promise," such a claim sounds in contract law. *Hargrave v. Oki Nursery, Inc*., 636 F.2d 897, 899 (2d Cir. 1980). A properly-pled fraudulent inducement claim, by definition, constitutes an independent tort. To maintain a claim of fraudulent inducement, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir. 1996). "[F]raudulent inducement claims and breach of contract claims relate to two different actions by a defendant at two different times. The duty to refrain from using fraud to obtain a contract is separate and distinct from the duty to perform a contract already entered into." 48 AM. JUR. 3D *Proof of Facts* 329, § 1 (2004). Fraudulent inducement is also independent insofar as defendant's misrepresentation is "collateral" or "extraneous" to the contract. *Deerfield Comm. v. Cheesebrough Ponds, Inc.,* 68 N.Y.2d 954, 956 (1986). A misrepresentation is collateral or extraneous if it is "not integrated into the contract at issue." *OHM Remediation Services Corp. v. Hughes Environmental Systems, Inc.* 952 F.Supp. 120, 123 (N.D.N.Y. 1997). Accordingly, while not all torts are independent of contract claims, a properly-pled fraudulent inducement claim is a fundamentally independent claim.

Though *dicta* abound, neither the Second Circuit[18] nor the Court of Appeals of New York[19] has ruled on whether a claim of fraudulent inducement arises from the subsequent contract. Lower court opinions, including those of this one,[20] are somewhat inconsistent.[21] Perhaps that inconsistency is not surprising; fraudulent inducement – as a particular species of fraud – "combines both contract and tort law concepts [and is] at the juncture point of contract and tort law."[22] 48 AM. JUR. 3D *Proof of Facts* 329, § 1 (2004); *cf. Merrill Lynch & Co., Inc. v.*

---

[18] "The Court of Appeals has since suggested that these requirements [public wrong and extraordinary egregiousness] are applicable whenever an action 'has its genesis in the contractual relationship between the parties.' . . . We need not decide whether the 'public harm' requirement set forth in *Rocanova* applies to claims for fraud[ulent inducement] . . . because we agree with the district court that the defendants' alleged conduct was not 'sufficiently egregious' or 'willful' to warrant the imposition of exemplary damages . . . ." *Schonfeld v. Hilliard,* 218 F.3d 164, 183-84 (2d Cir. 2000) (quoting *New York Univ.*, 87 N.Y.2d at 316).

[19] In *Rocanova*, the Court of Appeals of New York affirmed the lower Court's dismissal of plaintiff's fraudulent inducement claim and never reached the question whether a properly pled fraudulent inducement claim arises from the contractual relationship. 83 N.Y.2d at 614. In *New York University*, the same Court determined that plaintiff "allege[d] nothing more than a breach of contract . . . it does not allege a cause of action for fraud in the inducement. . . . In view of this disposition, we have no occasion to address the sufficiency of the complaint's claim for punitive damages . . . ." 87 N.Y.2d at 318, 320.

[20] *Compare Doehla v. Wathne Limited, Inc.* 98 Civ. 6087, 2000 WL 987280, at *9 (S.D.N.Y. Jul. 7, 2000) (Haight, J.) ("While there is no requirement that the fraud be aimed at the general public to recover punitive damages, plaintiffs must plead and prove that defendants engaged in gross, wanton, or willful fraud or other morally capable conduct.") *with W.S.A., Inc. v. ACA Corp.*, 94 Civ. 1493, 1998 WL 635536, at *1-2 (S.D.N.Y. Sept. 15, 1998) (Haight, J.) ("[I]n the wake of *Rocanova,* the lower New York appellate courts have consistently applied the "public wrong" rule to tort and contract cases alike . . . Because ACA does not allege a pattern of conduct harmful to the general public, Harmon's motion for summary judgment on ACA's punitive damages claim is granted.). Both cases concern fraudulent inducement claims.

[21] Following *Rocanova*, two district courts have refused to apply the public wrong or extraordinary egregiousness requirements to a fraudulent inducement claim. *Doehla*, 2000 WL 987280; *Blank v. Baronowski*, 959 F.Supp 172 (S.D.N.Y. 1997) The remainder of state and federal courts have required a showing of the public wrong and extraordinary egregiousness requirements for fraudulent inducement, albeit without much analysis. *See, e.g., Merrill Lynch & Co.,* 2003 WL 22795650; *Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001); *New Paradigm Software Corp. v. New Era of Networks, Inc.,* 107 F.Supp.2d 325 (S.D.N.Y. 2000); *The City of New York v. Coastal Oil New York, Inc.,* 96 Civ. 8667, 1999 WL 493355 (S.D.N.Y. Jul. 12, 1999); *RNB Garments Philippines, Inc. v. Lau,* 98 Civ. 4561, 1999 WL 223153 (S.D.N.Y. Apr. 16, 1999); *Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* 94 Civ. 5220, 1998 WL 665138 (S.D.N.Y. Sept. 25, 1998); *Kunica v. St. Jean Fin., Inc.,* 97 Civ. 3804, 1998 WL 437153 (S.D.N.Y. Aug. 3, 1998); *Katz v. The Dime Sav. Bank, FSB,* 992 F.Supp. 250 (W.D.N.Y. 1997); *Colton, Hartnick, Yamin and Sheresky v. Feinberg,* 227 A.D.2d 233 (1st Dep't 1996); *Bibeau v. Ward,* 228 A.D.2d 943 (3rd Dep't 1996); *Murray-Gardner Mgmt. Inc. v. Iroquois Gas Transmission Sys. L.P.,* 229 A.D.2d 852 (3rd Dep't 1996).

[22] *Cf. 11 Corbin on Contracts* § 1077, at 382-83 (Interim Edition 2002) ("The classification of wrongs into torts and breaches of contract often leads, as in the case of other legal classifications, to an erroneous belief in exactitude and certainty. There is no exact line: instead, there is a zone of overlapping. . . . A greater flexibility of remedy exists in cases within the zone of overlapping because *the court is free to choose a rule customarily applied in either field*, in accordance with the particular combination of facts before it. Thus may be explained many seeming inconsistencies in the award of punitive damages.") (emphasis supplied).

*Allegheny Energy, Inc.*, 02 Civ. 7689, 2003 WL 22795650, at *9 (S.D.N.Y. Nov. 25, 2003) ("[T]here is some uncertainty about when punitive damages are available if a claim for fraud[ulent inducement] is related to a claim for breach of contract.").

Under New York law, a claim of fraudulent inducement requires proof (1) that the defendant made a representation, (2) as to a material existing fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing plaintiff to rely upon it, (6) that plaintiff reasonably did so rely, (7) in ignorance of its falsity, (8) to her injury. *Computerized Radiological Servs. v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir. 1986); *see also Channel Master Corp.,* 4 N.Y.2d at 407 (summarizing elements of fraudulent inducement as "representation of a material existing fact, falsity, scienter, deception and injury."). Furthermore, New York courts clearly distinguish between a "promissory statement as to what will be done in the future," which gives rise only to a breach of contract claim, and a false "representation of present fact," which gives rise to a separable claim of fraudulent inducement. *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) *see also* Restatement (Second) of Contracts § 159, cmt. c. (1981) (same). "To say that a contracting party intends when he enters an agreement not to be bound by it is not to state 'fraud' in an actionable area, but to state a willingness to risk paying damages for breach of contract . . . ." *Briefstein v. P.J. Rotondo Constr. Co.,* 8 A.D.2d 349 (1st Dep't 1959).

In the case at bar, Stani first asserts that fraudulent inducement claims intrinsically arise from the subsequent contractual relationship, and hence punitive damages require proof of a public wrong and extraordinary egregiousness. I do not accept that argument.

Topps alleges that Stani fraudulently induced Topps to enter into the 1985 Amendment through misrepresentations made in Stani's letter dated January 17, 1985 as well as other

"communications with Plaintiff in or about January 1985."  Fourth Amended Compl. ¶¶ 42-43.

The 1985 Amendment was actually consummated on May 1, 1985.  Orr Aff., Ex. E.  The finder

of fact would have to examine the evidence concerning these communications to determine

whether Topps adequately demonstrated that it was improperly induced into the contract by

Stani's representations.  Did Stani make representation made about a then-present material fact?

Was that representation false?  When the representation was made was it known to be false?  Did

Stani intend the representation to induce reliance?  Did Topps actually rely on the

misrepresentation?  Was Topps' reliance reasonable?  The finder of fact need not inquire into

anything of substance contained in the contract.  There need be no evidence of the terms, the

meaning of the terms, or whether parties have performed or breached.  The actual contract is

relevant only insofar as its existence is evidence of Topps' detrimental reliance on the

misrepresentations.  When all of the essential contours of a claim *precede* the subsequent

contractual relationship, such a claim cannot reasonably be said to arise from that relationship.

Rather, the contract simply constitutes the culmination of the allegedly-tortious conduct.[23]

However, Stani's second argument is persuasive. Whether or not fraudulent inducement

claims intrinsically arise from the subsequent contractual relationship, Topps' claim  that it was

fraudulently induced to amend the 1980 Agreement by Stani's 1985 letter arises directly from a

twenty-eight year contractual relationship.  In other words, the agreement which Topps asserts it

was fraudulently induced into entering (the 1985 Amendment), was the fourth contract between

Stani and Topps, and its purpose was to amend the third contract (the 1980 Agreement).  In these

---

[23] Moreover, treating fraudulent inducement claims separately from the resulting contract is consistent with sound judicial policy.  Jurisprudential deference to contractual remedies is not warranted where one party was induced into a contract based upon intentional and material misrepresentations of the other.  The contractual relationship would not have been consummated but for those misrepresentations.  The imposition of punitive damages properly punishes and deters future misrepresentations proffered to induce contractual relationships, without burdening those breaches which the law seeks to protect.  Because "a tort by a defaulting promisor is no less a tort," *Brinks Inc. v. City of New York*, 717 F.2d 700, 704-05 (2d Cir. 1983), protecting the availability of tort remedies at this stage of the litigation supports the careful balance of the policies undergirding both tort and contract remedies.

circumstances, Topps' fraudulent inducement claim arises from its long-standing contractual relationship with Stani, and hence Topps must satisfy the four *Rocanova* elements in order to receive punitive damages. There is no issue of material fact here: Stani's conduct does not, as a matter of law, constitute "a gross and wanton fraud upon the public," *Walker*, 10 N.Y.2d at 406, and hence, as a matter of law, punitive damages are unavailable to Topps on this claim.

### 3. Trade Secret Misappropriation[24] (Second Claim)

"New York law apparently allows the recovery of punitive damages in a trade secrets case if the defendant's conduct has been sufficiently 'gross and wanton.'" *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991) (quoting *Huschle v. Battelle,* 308 N.Y.S.2d 235 (1st Dep't 1970), *aff'd,* 31 N.Y.2d 767, 338 (1972)). Stani argues, however, that New York law – specifically the Appellate Division's decision in *Huschle* – also imposes a public harm requirement on misappropriation claims. Defendant's Memorandum of Law, p. 13. While there is dicta in *Huschle* concerning "public right[s]," it does not apparently bear on the Appellate Division's decision in that case. *Huschle,* 33 A.D.2d at 235. Moreover, the Court of Appeals' affirmance summarized the Appellate Division's holding as follows: "The Appellate Division . . . held that any wrongful appropriation of the trade secret was not so gross and wanton as to justify punitive damages." *Huschle*, 31 N.Y.2d at 768; Plaintiff's Memorandum in Opposition, p. 16. The Court of Appeals does not make any mention of a public harm requirement. *See also, General Aniline & Film Corp. v. Frantz*, 272 N.Y.S.2d 600, 610 (N.Y.Sup. 1966) (awarding

---

[24] Topps' claim for misappropriation of trade secrets is an independent tort and is not grounded solely in the contractual relationship between Stani and Topps. If it were, one could argue that it "arises from" or "has its genesis in" the contractual relationship and should be subject to the four-factor *Rocanova* test. Rather, Topps claims that "Stani knowingly and willfully misappropriated and used Topps Technology by improper means in violation of (i) the agreement; and (ii) the parties' confidential relationship created by their course of dealing over many years." Fourth Amended Compl. & 42. Even in the absence of a contract, the misuse of a trade secret obtained within a confidential relationship may give rise to an independent tort claim for misappropriation. Restatement of Torts § 757 (1939); *see also Hudson Hotels Corp. v. Choice Hotels Intern*., 995 F.2d 1173, 1176 (2d Cir. 1993); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir. 1990); *Heyman v. A.R. Winarick, Inc.,* 325 F.2d 584, 586 (2d Cir. 1963); *Speedry Chem. Prods., Inc. v. Carter's Ink Co.,* 306 F.2d 328, 331 (2d Cir.1962); *Sublime Products, Inc. v. Gerber Products, Inc.*, 579 F.Supp. 248, 252 (S.D.N.Y. 1984).

$50,000 in a trade secret misappropriation case due to defendant's "wilful [sic] and intentional breach of confidence and wanton disregard of the property rights of others").

Furthermore, neither the Second Circuit nor this Court has required proof of a public harm for claims seeking punitive damages for trade secret misappropriation. *A.F.A. Tours, Inc.*, 937 F.2d at 87; *Softel, Inc. v. Dragon Medical and Scientific Communications Ltd.*, 891 F.Supp. 935 (S.D.N.Y., 1995) (awarding $250,000 in punitive damages for "willful" trade secret misappropriation where there is no evidence of a public harm nor any mention of a similar requirement).

As a matter of sound jurisprudence, the fact that punitive damages may be available for egregious instances of misappropriation is not surprising. The Rule delineated in the Restatement of Torts – which New York Courts regularly cite as the basis for the tort of misappropriation – "rests not upon a view of trade secrets as physical objects of property but rather upon abuse of confidence or impropriety in learning the secret." Restatement of Torts § 757 cmt. b (1939). Therefore, damages are not necessarily awarded simply to compensate the aggrieved party, but also to punish the egregious offender and deter future offenders. Hence, under New York law punitive damages are available for a misappropriation of trade secrets claim, but only if defendant's conduct is sufficiently gross and wanton.

Because punitive damages are intended to punish the wrongdoer and deter others so inclined, their availability is measured by the severity of defendant's conduct, which is a determination that can best be made after each party has a full opportunity to present their evidence. *Chase Manhattan Bank, N.A. v. Perla*, 411 N.Y.S.2d 66, 69 (4th Dep't 1978). Hence, whether Stani's conduct was sufficiently egregious to satisfy *Huschle's* "gross and wanton" test is a question best answered by the finder of fact. *Loughry v. Lincoln First Bank,* 67 N.Y.2d 369,

378 (1986) ("the decision to award punitive damages in any particular case, as well as the amount, are generally matters within the sound discretion of the trier of fact"); *AT&T Information Systems, Inc. v. McLean Business Services, Inc*., 572 N.Y.S.2d 582, 583 (4th Dep't 1991). As such, I deny Stani's motion for summary judgment on the question of punitive damages for the alleged misappropriation of trade secrets.

## D. Disgorgement of Stani's Profits

Topps' First Claim for breach of contract, and its Second Claim for misappropriation of trade secrets, assert that Topps is entitled to recover Stani's profits due to Stani's continued use and dissemination of so-called Topps Technology. Fourth Amended Compl. ¶¶ 21, 33. Stani responds that if Topps were to prevail at trial, as a matter of law the most it would be entitled to is the 3% royalty rate established in the contract. Defendant's Memorandum, p. 16. First, Stani argues that Topps' claims for misappropriation and breach of contract are "essentially identical," so Topps should not be able to recover profits for the former, since they are generally not available for the latter. *Id.* at 16-18. Second, Stani argues that because it has added value to Topps Technology, it would be unjust to award Topps Stani's "entire profit." *Id.* at 19-22. Neither of Stani's arguments is particularly compelling.

New York law provides three methods of awarding damages for misappropriation of trade secrets – compensation for plaintiff's losses, an accounting of defendant's profits, or a reasonable royalty – and the appropriate measure of Topps' damages should be determined after full presentation of the facts in the event that Topps prevails at trial. However, insofar as Topps requests disgorgement for breach of contract, as an independent claim sounding in contract law, disgorgement is not an appropriate remedy and Stani's motion for summary judgment in that regard is granted.

1.  Misappropriation of Trade Secrets (Second Claim)

As a preliminary matter, Stani's contention that the misappropriation claim is merely an attempt to bootstrap otherwise-unavailable damages can be quickly disposed of.  In fact, Stani largely abandons that position in its Reply Memorandum, relegating it to two desultory sentences in a footnote.  Defendant's Reply Memorandum, n.7.  As described in some detail above, the duty to refrain from misappropriating another's trade secrets exists separate and apart from a contractual obligation to refrain from the same.  *See, e.g., Channel Master Corp.* 4 N.Y.2d at 408.  While Topps may not be awarded dual *compensatory* damages which could provide a windfall recovery, they may recover damages in tort which are unrecoverable as contract damages.

Nor can Stani seriously contest that an accounting of defendant's profits is a proper remedy in a case concerning misappropriation of trade secrets; a remedy which the Second Circuit has called "an appropriate measure of damages under New York law." *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc*., 118 F.3d 955, 969 (2d Cir. 1997) (citing *David Fox & Sons, Inc. v. King Poultry Co.,* 23 N.Y.2d 914 (1969); *see also A.F.A. Tours, Inc.*,  937 F.2d at 87; *LinkCo, Inc. v. Fujitsu Ltd*., 232 F.Supp.2d 182, 185-86 (S.D.N.Y. 2002); *Town & Country House & Home Service, Inc. v Newbery*, 3 N.Y.2d 554, (1958); *Michel Cosmetics, Inc. v Tsirkas*, 282 NY 195, (1940); *Hecht Foods, Inc. v Sherman*, 351 N.Y.S.2d 711 (2nd Dep't 1974); *American Electronics, Inc. v Neptune Meter Co.*, 290 N.Y.S.2d 333 (1st Dep't 1968); *Harry R. Defler Corp. v Kleeman*, 243 N.Y.S.2d 930 (4th Dep't 1963); Michael A. Rosenhouse, *Proper Measure and Elements of Damage for Misappropriation of Trade Secret*, 11 A.L.R.4th 12 § 2(a) (2004) ("The most commonly accepted measure of damages for trade secret misappropriation is the defendant's profits . . . .").

Accordingly Stani is reduced to arguing that simply because its efforts added value to Topps Technology, it would be unjust to require Stani to disgorge the entirety of its profits. Rather, the argument continues, because the parties agreed upon a royalty rate of 3%, and because New York law recognizes royalties as an appropriate measure of damages, Topps should be unconditionally limited to the royalty rate.[25]   However, the briefs are replete with disputed factual issues, such as the extent to which Stani's profits reflect value beyond that attributable to the alleged-misappropriation; what actually constitutes Topps Technology; and whether reverse engineering was employed by Stani, and if so, whether it was properly employed within the Topps/Stani relationship.  The resolution of what, if any, damage measures would be appropriate in this case necessitates a full factual inquiry and hence is ill-suited for a motion on summary judgment.  For these reasons, I deny Stani's motion for summary judgment on the issue of disgorgement of Stani's profits for misappropriation of trade secrets.

---

[25] Stani's Memorandum of Law devotes one paragraph to discussing "design-around costs" as an alternative measure, citing an Eleventh Circuit case which apparently applied such a measure.  Defendant's Memorandum of Law, p. 24. Design-around costs have not been employed by New York Courts, and Stani does not discuss them further in their Reply Memorandum, focusing instead on the 3% royalty rate.

## 2. Breach of Contract (First Claim)

Elementary principles of contract law dictate that damages for a breach of contract should put the non-breaching party in the position it would have occupied but for the breach; the injured party should not recover more from the breach than the party would have gained had the contract been fully performed. *See supra* Part C.1; *Kenford Co., Inc. v. County of Erie*, 73 N.Y.2d 312, 319 (1989) ("*Kenford II*"); *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974); *see also Kenford Co. v. County of Erie,* 67 N.Y.2d 257 (1986) ("*Kenford I*"); *Goodstein Const. Corp. v. City of New York,* 80 N.Y.2d 366 (1992). Disgorgement of profits is not an appropriate remedy for a breach of contract. *See, e.g., Burger King Corp. v. Mason*, 710 F.2d 1480, 1494 (11th Cir. 1983). Disgorgement looks to the defendant's ill-gotten gains, rather than to the plaintiff's losses, and hence is not a suitable remedy for a breach of contract.

As a consequence, although disgorgement may be available to Topps to remedy the independent tort of misappropriation of trade secrets, it is not available on the breach of contract claim, and Stani's motion for summary judgment on that issue is granted.

### III. CONCLUSION

In these circumstances, and based upon the foregoing:

1. Stani's motion for summary judgment on Topps' Fourth and Fifth Claims is denied.

2. Stani's motion for summary judgment on Topps' demand that Stani be estopped from claiming that the 1985 Amendment altered the 1980 Agreement is granted.

3. Stani's motion for summary judgment on the issue of punitive damages relating to Topps' breach of contract and fraudulent inducement claims is granted.

4. Stani's motion for summary judgment on the issue of punitive damages relating to Topps' misappropriation claim is denied

5. Stani's motion for summary judgment on the issue of disgorgement of Stani's profits for misappropriation of trade secrets is denied.

6. Stani's motion for summary judgment on the issue of disgorgement of Stani's profits on Topps' breach of contract claim is granted.

In the light of these rulings, counsel for the parties are directed to send letters to the Court, with copies to each other, not later than August 31, 2005, advising (1) whether any further pretrial discovery is required; (2) if so, the nature and extent of that discovery; and (3) if the case is now trial ready, the estimated time each party will require for the presentation of its case in chief. The Court will then enter its final pretrial order and schedule the case for trial.

It is SO ORDERED.

Dated: New York, New York
        August 2, 2005

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE