UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
:
THE TOPPS COMPANY, INC.,                    :
:
            Plaintiff,                      :
                                            :          99 Civ. 9437 (CSH)
      - against -                           :
                                            :          MEMORANDUM, OPINION,
                                            :          AND ORDER
CADBURY STANI S.A.I.C. f/k/a                :
PRODUCTOS STANI SOCIEDAD                    :
ANONIMA INDUSTRIAL Y                        :
COMMERCIAL,                                 :
                                            :
            Defendant.                      :
                                            :
-----------------------------------------------------------------x

HAIGHT, Senior District Judge:

Defendant moves for partial summary judgment. Plaintiff resists the motion. This opinion

decides it.

## I. INTRODUCTION

This case is a tale of two companies, once friends and collaborators, now enemies and

scorched-earth litigators; and of chewing gum.

Chewing gum is "a type of confectionery which is designed to be chewed instead of

swallowed,"[1] "made of a 'gum base' with added flavoring and sometimes food coloring. The exact

composition of gum bases is usually a trade secret, but common ingredients can be latexes (e.g.,

leche, caspi, sorva, nispero, tunu, jelutong, or chicle, which is still commercially produced), paraffin

---

[1] Wikipedia, the Free Encyclopedia (http://en.wikipedia.org) (visited July 25, 2006).

1

wax or beeswax, polyethylene, polyvinyl acetate, stearic acid, and various natural gums."[2] As the case at bar shows, chewing gum has achieved global status and commercial transactions for its manufacture and sale can involve millions of dollars. Some form of chewing gum can be traced to antiquity: "The ancient Greeks chewed mastiche – a chewing gum made from the resin of the mastic tree."[3] In modern-day America, chewing gum achieved its popularity as the result of an accidental discovery by the nineteenth-century inventor Thomas Adams, who was trying to create a synthetic rubber. Adams "attempted to make toys, masks, rain boots, and bicycle tires out of the chicle from Mexican sapodilla trees, but every experiment failed. One day in 1869, he popped apiece of surplus stock into his mouth and liked the taste. Chewing away, he had the idea to add flavoring to the chicle. Shortly after, he opened the world's first chewing gum factory. In February 1981, Adams New York Gum went on sale in drug stores for a penny apiece." [4]

The Plaintiff in this case is The Topps Company, Inc. ("Topps"). Topps is a New York corporation that makes and sells chewing gum. Topps gum has been and is sold under a number of brand names, the most prominent being the "Bazooka" brand. Three brothers named Shorin formed Topps in 1968. Arthur T. Shorin, a son of one of the three co-founders, has been Topps's chief executive officer for 26 years. In 1980 Edward E. Shorin, a vice-president of Topps, signed on behalf of the Plaintiff the two most recent of the four agreements with the Defendant that are pertinent to the present motion.

The Defendant is identified in the caption as "Cadbury Stani S.A.I.C. f/k/a Productos Stani

---

[2] *Id.*

[3] http://inventors.about.com (visited July 25, 2006).

[4] *Id.*

Sociedad Anonima Industrial y Commercial." The "f/k/a/" legal shorthand reflects the fact that at the time the pertinent agreements were executed, the Defendant, an Argentinian corporation, was named Productos Stani Sociedad Anonima Industrial y Commercial. In 1993 that corporation was acquired by Cadbury Schweppes, PLC, a United Kingdom corporation, which renamed its Argentinian acquisition in the manner appearing in the caption. I will hereafter refer to the Defendant as "Stani."

At the times pertinent to this case Topps and Stani were both family owned enterprises: Topps by the Shorin family,[5] Stani by an Argentinian family named Stanislavsky. Between 1957 and 1985, the parties entered into five written agreements. In order fully to comprehend the parties' rights and obligations, and resolve Stani's present motion for partial summary judgment, the first four of these agreements must be considered, although some lie closer to the heart of the case than others. Those agreements are discussed in Part II.A., *infra*.

## II. BACKGROUND

### A.    The Agreements Between Topps and Stani

I will discuss the five written agreements between Topps and Stani in chronological order, beginning with the earliest one.

### 1.    The 1957 Original License Agreement

In October 1957, Topps and Stani entered into a licensing agreement (the "Original License Agreement"), whereby Topps granted to Stani the exclusive right to "manufacture, sell and distribute chewing gum under the Topps brands" in Argentina, Bolivia, Chile, Paraguay and Uruguay. Original

---

[5] Topps was acquired in a leveraged buyout acquisition by a group led by Forstmann Little & Co. and Topps management in 1984. The company became publicly held in 1987. http://www.topps.com (visited July 25, 2006).

3

License Agreement, ¶¶ 1, 7. Topps agreed to share with Stani "the know-how, formulae, processes and techniques used by Topps." *Id.* In return, Stani agreed to pay Topps royalties based on the sales of the licensed products. *Id.* at ¶¶ 8-10. The Original License Agreement contained an expiration date in October 1977. It was signed by Joseph Shorin, at that time the president of Topps, and by Arnoldo Stanislavsky, the president of Stani. The signatures of these corporate officers were notarized by Edward Shorin, Joseph's brother, and a future vice president and signatory of Topps.[6]

## 2.    The 1976 License Agreement

It would appear that during the Original License Agreement's twenty-year life span, Topps and Stani dwelt together in mutual harmony and commercial benefit. In May 1976, with the Original License Agreement about to expire, the parties executed a second agreement (the "1976 License Agreement"). The preamble recited that

> WHEREAS, TOPPS and STANI have enjoyed the benefits of a contract of technical assistance since October 24, 1957;
>
> WHEREAS, STANI wishes to continue receiving and TOPPS wishes to continue providing manufacturing technology, marketing concepts and techniques, administrative and consultive assistance and trademark use (such technology, assistance and trademark use being hereafter more fully described and defined).
>
> NOW, THEREFORE, TOPPS and STANI hereby mutually agree as follows:

I pause at this point to observe that, in its opposition to Stani's present motion, Topps contends that the only document the Court should consider in determining the parties' rights and obligations is a revised license agreement they executed in 1980. I consider that agreement in Part

---

[6] The factual recitation in the accompanying paragraph of text is adapted from the Court's earlier opinion resolving a prior motion by Stani for partial summary judgment. *See The Topps Company, Inc. v. Cadbury Stani S.A.I.C.*, 380 F.Supp.2d 250, 252 (S.D.N.Y. 2005).

II.A.3., *infra*, but for the reasons stated in Part III I do not agree with Topps that it is the only agreement I should consider. The 1976 License Agreement provides a contractual background pertinent to events that transpired later.

To resume consideration of the 1976 License Agreement: ¶ 1 contained definitions of certain words and phrases that appear in the document. ¶ 1(a) provided:

> "TOPPS Technology" means the specialized knowledge and experience of TOPPS applicable to the manufacture and/or sale of Licensed Products, such as (but not limited to):
>
> (I)      manufacturing technology consisting of formulae, recipes, processes, equipment utilization, labour and equipment standards, ingredient specifications, factory management and production planning techniques, factory facility design and layout and quality control procedures, including gum base technology; and
>
> (ii)     marketing technology consisting of finished product design, packaging material design and specifications, promotional and advertising techniques, marketing techniques and sales force management techniques,
>
> (iii)    all other elements of TOPPS' knowledge and experience in the confectionery industry applicable to Licensed Products currently being produced by TOPPS or future products produced by TOPPS.[7]

¶ 1(a)(e) defined "Licensed Products" as "all Chewing Gum products and the Other Topps Products produced and sold by STANI." ¶ 1(c) defined "Chewing Gum" as "all types of chewing gum employing TOPPS technology ..." ¶ 2 provided that TOPPS granted to STANI (a) "the exclusive non-assignable right and license to manufacture and sell during the continuance of this Agreement Licensed Products within the Territory" covered by the agreement, defined by ¶ 1(h)

---

[7] The 1976 License Agreement refers to its separate numbered provisions as "clauses." In their briefs and oral arguments about the proper construction of the contractual scheme, counsel use the word "paragraphs." For the sake of clarity, in this Opinion I will use the noun "paragraph" or the symbol "¶", followed by the accompanying number.

as Argentina, Bolivia, Chile, Paraguay and Uruguay, and other countries under circumstances not pertinent to this motion; and (b) "the exclusive non-assignable right and license to use during the continuance of this Agreement the TOPPS Trademarks in the Territory, in connection with the sale of Licensed Products within the Territory." ¶ 3 provided that the Topps trademarks and the Topps technology "shall at all times remain the exclusive property of TOPPS and the rights hereby granted to STANI shall be by way of license or, if required by trademark regulations within the Territory, by way of registered user rights."

¶ 7(a) obligated Topps to "continue supplying STANI with TOPPS' Technology which encompasses all the engineering, production and management disciplines and techniques used or developed by TOPPS and/or its affiliates via continuous communication with and the training of STANI personnel in the application of TOPPS' Technology to the production of its Licensed Products." ¶ 7 went on to impose further obligations upon TOPPS which it is not necessary to quote. Nor is it necessary to quote the several obligations placed upon Stani with respect to its conduct in the manufacture and marketing of Licensed Products. Stani's economic obligation was set forth in ¶ 20, which provided: "In consideration of the license and rights granted to STANI hereunder, STANI will pay to TOPPS a license fee calculated at the rate of 3% of the Net Sales of Licensed Products in each Contract Year."

The manner in which the 1976 License Agreement would come to an end was provided for principally in ¶ 6, which I will quote in its entirety:

> Subject to the provisions of clauses 22(f), 24 and 28, the license granted in clause 2 of this Agreement shall begin on the 1 st day of May, 1976, and shall continue for a period of 10 years. However, at STANI's sole option, the term of this Agreement may be extended for an additional 10 year period (unless at the time of STANI's exercise

6

of this option, TOPPS is entitled to terminate the Agreement as
provided in clauses 22(f), 24 or 28, it being understood that this clause
6 shall not prevent or limit TOPPS' right to terminate this Agreement
as provided in those aforementioned clauses) provided that at any time
not later than two years prior to the expiration of the initial 10 year
term, STANI notifies TOPPS in writing of its decision to exercise this
option to continue this Agreement in force for an additional 10 years.

¶ 6 incorporated by reference ¶¶ 22(f), 24 and 28 in a manner suggesting that these
paragraphs had something to do with a termination of the 1976 License Agreement. ¶ 22(f), which
deals with the consequences of governmental currency regulations, has no discernible relation to
termination of the agreement. ¶ 24 provided that either TOPPS or STANI "may terminate this
Agreement" in the event of specifically described conduct by the other. ¶¶ 28 provided if
performance of the agreement was prevented for more than eighteen months by any *force majeure*
occurrence "beyond the control of TOPPS or STANI, either party shall have the right to terminate
this Agreement." I also note that ¶¶ 25, 26 and 27 specify certain conduct that the parties must
follow in the event of a termination under ¶ 24.

The 1976 License Agreement was apparently signed[8] by Joseph Shorin on behalf of Topps
and Arnoldo Stanislavsky on behalf of Stani.

## 3.    The 1980 Amended and Restated License Agreement

The ten-year 1976 License Agreement would expire in 1986. However, on October 27,
1980, the parties simultaneously executed two additional agreements which extended and altered
their commercial relationship. One of these agreements is captioned "Amended and Restated
License Agreement." There is general agreement that its terms and provisions are applicable to

---

[8]    The signatures are not that legible and the names of the signatories are not typed
underneath them.

those rights and obligations of the parties relevant to the present motion. I consider that agreement in this sub-Part, changing the tense of the analysis from the past ("provided") to the present ("provides").

The second agreement the parties signed on October 27, 1980 is captioned "Escrow Agreement." I will refer to it as "the 1980 Escrow Agreement" and consider its provisions in Part II.A.4.

Both agreements were signed by Edward E. Shorin on behalf of Topps and Arnoldo Stanislavsky on behalf of Stani.

Turning to the 1980 Amended License Agreement (the Amended License Agreement"), the careful reader will note that many of its provisions echo those of the 1976 License Agreement, but there are differences.

The preamble to the Amended License Agreement echoes the first two paragraphs of the 1976 License Agreement, and then recites that "Topps and Stani are parties to a License Agreement dated as of May 3, 1976, and desire to amend and restate such License Agreement as hereinafter set forth."

Paragraph 2 of the 1980 Amended License Agreement sets out Topps' grants to Stani:

> TOPPS hereby grants to STANI:
> a) the exclusive non-assignable right and license to manufacture in Argentina, Bolivia, Chile, Paraguay, and Uruguay and sell within the Territory, during the continuance of this Agreement, Licensed Products employed by TOPPS in the United States of America and/or its existing affiliated plants...
> b) the exclusive non-assignable right and license to use during the continuance of this Agreement the TOPPS Trademarks in the Territory, in connection with the sale of Licensed Products within the Territory...

8

This paragraph describes the substance of the licenses granted by the Amended License Agreement. It grants a license to manufacture and sell "Licensed Products" and to use Topps trademarks. "Licensed Products" is defined in the agreement as: "all Chewing Gum products and Other Topps Products produced and sold by Stani." ¶ 1(e). "Chewing Gum" products is defined as "all types of chewing gum manufactured by STANI employing TOPPS Technology, including, but not limited to BAZOOKA Bubble Gum, adult products and pharmaceutical products and whether or not utilizing Topps Trademarks." ¶ 1(c). "Other Topps Products" is defined as: "all products not considered to be Chewing Gum, such as, but not limited to toys, picture card novelties, confectionary and food products created, designed and produced by TOPPS." ¶ 1(d). "TOPPS Technology" is defined in the Amended License Agreement as:

> ...the specialized knowledge and experience of TOPPS applicable to the manufacture and/or sale of Licensed Products, such as (but not limited to):
>
> (i)  manufacturing technology consisting of formulae, recipes, processes, equipment utilization, labour and equipment standards, ingredient specifications, factory management and production planning techniques, factory facility design and layout and quality control procedures, including gumbase technology, and
>
> (ii)  marketing technology consisting of finished product design, packaging material design and specifications, promotional and advertising techniques, marketing techniques and sales force management techniques,
>
> (iii)  all other elements of TOPPS' knowledge and experience in the confectionery industry applicable to Licensed Products currently being produced by TOPPS or future products produced by TOPPS.

¶ 1(a). After describing in paragraph 2 the licenses granted by Topps to Stani, the Amended License Agreement provides in ¶ 3:

> The TOPPS Trademarks and the TOPPS Technology shall at all

9

> times remain the exclusive property of TOPPS or its assigns and the rights hereby granted to STANI shall be by way of license or, if required by trademark regulations within the Territory, by way of registered user rights.

Topps' grants to Stani under the License Agreement were provided in exchange for license

fees, governed by paragraph 20, which provides:

> In consideration of the license and rights granted to STANI hereunder, STANI will pay to TOPPS a license fee calculated at the rate of 3% of the Net Sales of Licensed Products in each Contract Year.

What the parties meant by "license and rights" is at the heart of the question now before the

Court. What is clear, however, is that the license and rights, granted in exchange for license fees,

were of limited duration. The License Agreement contains two paragraphs addressing the issue of

duration. The first of these, ¶ 6, deals with the *expiration* of the License Agreement. It provides

succinctly:

> Subject to the provisions of clauses 22(g), 24 and 26 the license granted in clause 2 of this Agreement shall expire on the 30th day of April, 1996.

The second paragraph relevant to the duration of the License Agreement is ¶ 24, referred to

in ¶ 6. ¶ 24 deals with the *termination* of the Agreement as the result of conduct by one party or the

other. Specifically, ¶ 24(a) provides that the License Agreement "may be terminated" by Stani:

> ...if any Fiduciary Successor to TOPPS...shall not, within the time period specified by the law, affirm this Agreement, or if any such Fiduciary Successor to TOPPS...or if any Third Party Successor to TOPPS shall at any time, default in observing or performing any of the essential conditions and stipulations contained in the Agreement...

10

¶ 24(b) specifies the conditions under which the License Agreement "may be terminated by

Topps":

> ...if STANI shall pass any resolution for, or be a party to
> proceedings for, winding up, liquidation, the appointment of a
> liquidator or receiver, or for any arrangement or composition with its
> creditors, or STANI shall default in observing or performing any of
> the essential conditions or stipulations contained in this Agreement...

¶ 5 contains extensive provisions that delineate Stani's obligations if Topps terminates the

License Agreement.  That paragraph provides:

> Upon the termination of this Agreement by TOPPS for any cause
> whatsoever,
> a) STANI will:
>         (I) return to TOPPS all materials received from TOPPS
> pursuant to or in accordance with this Agreement which shall then
> be in existence and in its possession or under its power or control
> and requested in writing to be returned;
>         (ii) execute and deliver any written instrument deemed
> necessary or desirable by TOPPS to place TOPPS in the position it
> occupied prior to the execution of this Agreement.
>         (iii) immediately inform TOPPS of its inventory of Licensed
> Products, and for a period of 60 days, STANI will have the right to
> sell the remaining inventory of Licensed Products in the Territory,
> but only at the standard selling price for each Licensed Product, as
> per the price list existing at the time of termination. If at the end of
> 60 days such inventory of Licensed Products remains unsold, then
> TOPPS shall have the right but not the obligation to liquidate those
> inventories for the account of STANI...The license fee shall be
> payable on the selling price of any inventory sold in accordance with
> this clause 25(a)(iii).
>         (iv) pay without delay all license fees, trade accounts and
> other monies which may then be due to TOPPS; and
> b) STANI will not:
>         (I) have any further right or claim to any of the material
> provided by TOPPS in accordance with this Agreement, except to
> dispose of it in accordance with TOPPS instructions, or to return the
> material to TOPPS: or
>         (ii) have any further right to use any of the TOPPS
> Trademarks or the TOPPS Technology except for use in connection

> with selling and disposing of Licensed products on hand in
> accordance with clause 25(a)(iii).

There are no parallel requirements or restrictions upon Topps in the event of a termination by Stani.

The parties were each granted rights under the License Agreement that, in essence, govern

the quality of the Licensed Products produced and sold by Stani. In ¶ 7 Topps renewed its

commitment to supply Stani with Topps Technology. That lengthy paragraph provides insight both

into what Topps Technology was understood to be, and what role it played in the License

Agreement. ¶ 7 provides:

> In consideration of the execution of this Agreement, TOPPS shall:
> a) continue supplying STANI with TOPPS' Technology which
>    encompasses all the engineering, production and management
>    disciplines and techniques used or developed by TOPPS and/or
>    its affiliates via continuous communication with and the training
>    of STANI personnel in the application of TOPPS' Technology
>    to the production and sale of Licensed Products.
> b) Make available at STANI's request the services of a technical
>    adviser at STANI's manufacturing facility for the purpose of
>    providing consultive assistance with STANI's manufacturing
>    operation...
> c) give at all reasonable times to a reasonable number of employees
>    of STANI such access to TOPPS' Headquarters offices and
>    factory in the United States of America as may be reasonably
>    necessary to enable them to become familiar and trained in
>    methods and procedures employed by TOPPS for the
>    manufacture and marketing of the Licensed Products and to be
>    kept informed of TOPPS research, development and innovations
> d) Make available to STANI any confidential information (other
>    than published information considered in the public domain)
>    relating to the manufacture, use or sales techniques of Licensed
>    Products which may come into TOPPS possession and shall keep
>    STANI informed throughout the duration of this Agreement of
>    any new manufacturing technique or new marketing and
>    promotional techniques for the sale of the Licensed Products and
>    advise STANI of changes in packaging designs of such products;
> e) Subject to availability and under selling terms to be determined
>    by TOPPS and upon request by STANI, TOPPS will: (I) sell to

12

STANI printed material required in the packaging of Licensed Products required in the packaging of Licensed Products at cost plus transportation…(ii) sell to STANI BAZOOKA flavor and other flavors and base manufactured by TOPPS which STANI may require in the production of the Licensed Products at prices not to exceed the prices invoiced by TOPPS to its other licensees…provided, however, that if by reason of circumstances beyond te control of STANI or TOPPS BAZOOKA flavor may not be imported into any country in the Territory in which STANI is manufacturing Licensed Products, TOPPS will cooperate with STANI to make such flavor available to STANI in such country by all reasonable means, other than by disclosure of TOPPS' formula for BAZOOKA flavor. (iii) rent to STANI for use in printing packaging materials of Licensed Products original artwork and/or duplicate printing plates on terms that such artwork shall be returned immediately upon written request by TOPPS, and that STANI will pay to TOPPS 10% of TOPPS' original cost of such artwork or the actual cost of preparing duplicate printing plates…

f) Provide STANI with quarterly appraisals of the quality of Licensed Products submitted for testing in accordance with clause 11;

g) Review STANI's marketing and selling objectives and plans, and provide written consultive judgment and suggestions about such data submitted by STANI;

h) Respond promptly, within 30 days at the latest, via correspondence to STANI's requests for consultive judgment or assistance about STANI's marketing and manufacturing activities with respect to Licensed Products;

i) Provide STANI with Licensed Product ingredient specifications and assist STANI to identify ingredient suppliers in order for STANI to purchase ingredient components to best advantage while maintaining TOPPS quality standards.

*Id.* at ¶ 7. Along with these extensive obligations that Topps undertook to provide Stani with

technology, training, quality control, and materials, Topps retained for itself a right of inspection.

¶ 8 provides:

In order to descharge [sic] its responsibility to maintain its quality standards for Licensed Products, TOPPS shall have the right to inspect at its expense the manufacturing process and storage of

Licensed Products...

To assist Topps in its oversight responsibilities, Stani undertook to manufacture Licensed Products "in conformity" with Topps formulas and processes, to undertake modifications of these only with Topps' written approval, to sell only products that meet Topps' quality standards, to "actively and aggressively promote and expand" manufacture and sale of Licensed Products throughout the territory in which Stani was licensed to operate, and to send samples of new product lines (including promotional and advertising materials, if so requested by Topps) to Topps for inspection. ¶¶ 9-11.

The exchange of all of this information was made subject to a confidentiality clause:

> STANI obligates itself not to disclose to third parties any information relating directly or indirectly to the TOPPS Technology because the TOPPS Technology is deemed to be secret and confidential and intended solely for the use of STANI and its authorized employees.

¶ 12.

## 4. The 1980 Escrow Agreement

Simultaneously with the execution of the 1980 License Agreement on October 27, 1980, Tops and Stani also executed an Escrow Agreement bearing that date. Edward Shorin signed for Topps, Arnoldo Stanislavsky signed in his individual capacity, and an officer of Manufacturers Hanover Trust Company, the designated escrow agent, signed the document in that capacity.

The preamble to the Escrow Agreement recites that Topps had transferred "legal title to the registration in Argentina of the trademarks 'Bazooka', 'Topps' and related trademarks to the Verco Holding Corp., a New York corporation, all of the capital stock of which is issued in the name of [Arnoldo] Stanislavsky." Pursuant to the Escrow Agreement, Stanislavsky delivered to the escrow agent Verco's minute and stock books, its stock certificate, and a stock power "covering the Shares

14

executed by Stanislavsky." ¶ 1. The Escrow Agreement provided that

> [t]he Shares and the Stock Power shall be delivered by the Escrow
> Agent to Stanislavsky on May 31, 1996, unless (I) sooner delivered to
> it by Stanislavsky or to Topps, as hereinafter provided, or (ii) prior to
> May 31, 1996, the Escrow Agent shall have received a Notice of
> STANI Default from Topps or a Notice of Successor Default from
> Stanislavsky.

¶ 2(a). The noun "Default" as used in this provision refers to the acts of default specified in the 1976

License Agreement as amended and restated by the 1980 License Agreement.

At the time of its execution on October 27, 1980, Stani paid Topps $100,000 in order to obtain

the Escrow Agreement, a benefit that counsel for Stani described at the oral argument: "They [Topps]

got a hundred thousand dollars right there on the spot, again, for a trademark assignment that would

not be effective for another 16 years." Tr. 39.

## 5.    The 1985 Addendum to the 1980 License Agreement

The last agreement entered into by Topps and Stani was an addendum to the 1980 License

Agreement dated May 1, 1985. This document forms the basis of a claim by Topps that is not

implicated by Stani's present motion for partial summary judgment, and I say no more about it in this

Opinion.

## B.    The Contentions of the Parties

Before summarizing the contentions of the parties, it is first necessary to note a stipulation of

material facts agreed to by the parties. Topps and Stani stipulate that "[t]he 1980 [License]

Agreement expired by its own terms on April 30, 1996," Stipulations of Agreed Upon Facts, ¶ I.D.4.

In other words, the 1980 License Agreement expired as provided for in ¶ 6 of that agreement; a

termination of the sort described in ¶ 24 did not occur. The parties further stipulate that the 1980

15

Escrow Agreement "was entered into to transfer legal title of the 'Bazooka' trademark and related trademarks to Stani after the expiration of the 1980 [License] Agreement on April 30, 1996 in exchange for a payment of $100,000 by Stani to Topps in 1980," and that "Stani paid Topps $100,000 in 1980 for the Bazooka trademark in Argentina." *Id.*, ¶¶ I.F.1,2. In the light of those stipulations, and in the absence of any evidence or suggestion to the contrary, I assume that when the 1980 License Agreement expired on April 30, 1996, on May 31, 1996 the escrow agent appointed by the Escrow Agreement completed the transfer of Topps's Bazooka, Topps and related trademarks to Stani in the manner specified by that agreement.

In these circumstances, the core contentions of the parties may be summarized as follows.

## 1.     Topps's Contentions

Topps alleges that after the 1980 License Agreement expired in 1996, Stani continued to use Topps chewing gum formulas, which form a part of the "Topps Technology" as that phrase is used in the agreement.[9] Topps contends that the 1980 License Agreement licensed Stani to use those formulas; that the agreement provided that at all times the formulas remained the property of Topps; and that when the 1980 License Agreement expired in 1996, Stani's right to use the Topps formulas expired with the License Agreement. Topps claims that Stani's post-1996 use of Topps's chewing gum formulas gives rise to a claim in contract for breach of the 1980 License Agreement, and to a claim in tort for wrongful misappropriation of trade secrets.

## 2.     Stani's Contentions

Stani denies that it has made any use of "Topps Technology" (including chewing gum

---

[9] In opposing Stani's motion, Topps focuses solely upon its chewing gum formulas, without waiving any claim that Stani has used or is using other technical elements that may form a part of Topps Technology. Brief at 6.

16

formulas) subsequent to the expiration in 1996 of the 1980 License Agreement. That is a first line of defense which involves myriad factual issues precluding summary judgment. On its present motion for partial summary judgment, Stani assumes without conceding that it has made post-1996 use of Topps Technology. Stani contends that, on a proper reading of the contracts between the parties, with particular reference to the 1980 License Agreement and the 1980 Escrow Agreement, Topps permitted that use. It follows, Stani concludes, that Topps has no viable claim for breach of contract or for wrongful misappropriation.

## III. DISCUSSION

A.     **Preliminary**

With respect to Topps's claim for breach of contract, both Topps and Stani contend that the contracts are unambiguous, but they interpret them differently.[10]

Only Stani moves for summary judgment, based on its reading of the contracts. But the Court could *sua sponte* grant Topps summary judgment on its claims if I accept Topps's interpretation. It has long been the law of the Second Circuit that "as long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the propositions that there is no genuine issue of material fact to be tried." *First Financial Insurance Co. v. AllState Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir. 1999), citing *Lowenschuss v. Kane*, 520 F.2d 255, 261 (2d Cir. 1975) ("We have sanctioned a *sua sponte* award by the court of summary judgment to a non-moving party where it appears from the papers, affidavits, and other proofs submitted by the parties that there were no

---

[10]     While I use the plural noun "contracts" in text, Topps contends that the 1980 License Agreement is the sole relevant source of the parties' contractual rights and obligations. I do not agree, for the reasons stated *infra*.

17

disputed issues of material facts and that judgment for the non-moving party would be appropriate as a matter of law.").

## B.   Standards of Review

### 1.   Standards Generally Applicable to Summary Judgment

A court must grant a motion for summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317 (1986). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If there is "any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party," then summary judgment should be denied. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Summary judgment should only be granted if no rational fact-finder could find in favor of the non-moving party. *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir. 1994).

### 2.   Summary Judgment in Actions for Breach of Contract

18

As noted *supra*, the case at bar turns principally upon a question of contractual interpretation. "Summary judgment may be granted when the provisions of a contract convey a definite and precise meaning, absent any ambiguity." *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir.1994) (citation and internal quotation marks omitted). Moreover, Second Circuit case law makes it plain that summary judgment may also be appropriate even where the contract is ambiguous. "The relevant inquiry in deciding a motion for summary judgment is whether 'there is no genuine issue as to any material fact,' Fed.R.Civ.P. 56(c), 'a situation that obtains not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law.' " *Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n. 5 (2d Cir.1999) (citing and quoting *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 299 & nn. 9-11 (S.D.N.Y.1997), aff'd,166 F.3d 1201 (2d Cir.1998)).

In interpreting a written contract, a trial court's primary goal is to effectuate the intent of the parties as manifested by the language used in the contract. See *Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir.1992). Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968), quoted in *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987). However, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view 'strain[s] the contract language beyond its reasonable and ordinary

19

meaning.' " *Seiden Assocs. v. ANC Holdings*, 959 F.2d at 428, quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (Ct.App.1957). The court must determine whether or not a written contract is ambiguous; if it is not, "the court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence." *United States v. Paccione*, 1995 WL 662130, at *3-4 (S.D.N.Y.1995) (internal quotations omitted).

## C.    The Construction of the Contracts Between Topps and Stani

Topps prefers to characterize the 1980 Amended License Agreement as the sole source of the parties' rights and obligations pertinent to the case at bar. I do not agree. The intent of the parties can be fully understood only by reading the Amended License Agreement together with the 1976 License Agreement which preceded it, and, more importantly, with the simultaneously executed 1980 Escrow Agreement.[11]

The climactic scene in this contractual drama was played on October 27, 1980, when officers of Topps and Stani signed the Amended License Agreement and the Escrow Agreement. The parties have stipulated that "[a] Topps employee, who was not an attorney, drafted each of the license agreements and the 1985 Addendum." Stipulation of Agreed Facts, ¶ D.6. The record reveals that this "employee" was in fact Edward Shorin, a Topps vice-president. Stani does not press for the application of the maxim *contra proferentem*, and I would not apply it in any event, since the maxim

_____
[11] Contrary to the concern seemingly expressed in Stani's reply brief at 6 n. 2, reading the Amended License Agreement together with the Escrow Agreement does not involve "extrinsic evidence" or implicate the parol evidence rule. In that footnote, Stani cites *Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499 (2d Cir. 1970), and *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F.Supp. 693 (S.D.N.Y. 1976). Both cases considered whether a prior or contemporaneous oral contract between the parties could be considered together with a written contract between them. No such issue arises in the case at bar, because all the agreements between Topps and Stani were in writing.

20

is an aid to the construction of an ambiguous contract, and I do not regard the contractual scheme between Topps and Stani as ambiguous.

Reading the 1980 Amended License Agreement and Escrow Agreement together, it is entirely clear that by executing those two documents simultaneously, the parties agreed at that time to *extend* their commercial relationship and then to *end* it.

The extension of the relationship was achieved by ¶ 6 of the Amended License Agreement, which provided that the license it granted would expire on April 30, 1996. That constituted an extension of the relationship because ¶ 6 of the 1976 License Agreement provided that it would continue "for a period of 10 years," subject to an additional 10-year period "at Stani's sole option." Thus the Amended License Agreement guaranteed to Topps an additional 10 years of fee revenue (1986 to 1996).

The contracts read together brought about the projected ending of the relationship in 1996 because the Escrow Agreement provided that on May 31, 1996 (barring any default by Stani under the Amended License Agreement, which did not occur) "legal title to the registration in Argentina of the trademarks 'Bazooka,' 'Topps' and related products" would be finally and irrevocably transferred to Arnoldo Stanislavsky.

Topps contends on this motion that notwithstanding that contracted-for transfer of trademarks from Topps to Stanislavsky in May 1996, Stani cannot make any use of the "Topps Technology" after the Amended License Agreement expired in April 1996. Topps limits its analysis of Topps Technology to the chewing gum formulas, but the Amended License Agreement's definition of "Topps Technology" is more broad; indeed, it is as broad as language can make it. ¶ 1(a) of that agreement provides that "'Topps Technology' means the specialized experience of TOPPS applicable

21

to the manufacture and/or sale of Licensed Products"; specific examples of the technology are then listed but without limitation. On Topps's theory, the Topps trademarks were transferred to Stani but in manufacturing chewing gum under those trademarks, Stani could not use any of the Topps formulas or know-how supplied by Topps to Stani during a relationship which began in 1957.

## 1. Principles of Trademark Law

Topps's construction, that Stani received only the trademark for Bazooka gum and could not use the technology to make it, runs counter to the law of trademark.

A trademark is merely a symbol of goodwill and cannot be sold or assigned apart from the goodwill it symbolizes. *Marshak v. Green*, 746 F.2d 927,929 (2d Cir.1984) (citing the Lanham Act, § 10, 15 U.S.C. § 1060). As goodwill is inseparable from the underlying business with which it is associated, rights in a trademark cannot be transferred "in gross," or apart from an ongoing business. *See id.* ("There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable."). *See also Berni v. International Gourmet Restaurant, Inc.*, 838 F.2d 642, 647 (2d Cir. 1988). Moreover, the transferee or assignee must continue to offer products or services that are "substantially similar" to those of the seller or assignor. *Marshak*, 746 F.2d at 930.

These principles resonate in the case at bar because coupling a transfer of the Topps trademarks to Stani with a prohibition against using any of the broadly defined Topps Technology would constitute in practical reality a transfer of the trademark "in gross." As the Second Circuit held in *Marshak*, trademark law requires that the transferee of a trademark (Stani) continue to offer products or services substantially similar to those of the transferor (Topps). Topps would read the agreements so as to transfer the Topps chewing gum trademarks to Stani but deny to Stani the ability

22

to offer the same gum products to the public.[12]  I decline to hold that the parties intended to contract with each other in such a way as to violate the laws of trademark.[13]

Before turning from this consideration of trademark law as an aid to interpretation of the contracts between Topps and Stani, it is useful to reiterate the factual predicate for Topps's breach of contract claim, the accuracy of which I accept on Stani's motion for summary judgment on that claim.  Topps says that the Topps technology included (but was not limited to) the Topps formulas for making "the classic Topps Bazooka flavor; a gum softening agent; and gum base," Brief at 6, and that "Topps, for its contract claim, will prove at trial that Stani continued after April 30, 1996 to manufacture gum employing the Formulas," *id.* at 7, a continued use Topps contends breached the 1980 Amended License Agreement.  Stani denies that it has made any use of protected Topps technology since 1996;[14] and, in that regard, Topps acknowledges that "Topps never gave Stani the formula to "the [Bazooka] Superconcentrate," Ebert affidavit at ¶ 34, one of the several formulas used in the manufacture of the popular Bazooka brand, which Topps alleges Stani obtained through other improper means: "As Topps alleges and Stani denies, Stani thereafter [post-1996] continued to use the overall Topps flavor formula, with the only change being that it substituted the Superconcentrate that H&R reverse engineered for the Topps Superconcentrate in the Topps flavor formula." *Id.* at ¶

---

[12]  I do not lose sight of Stani's contention that it is not using any of the Topps Technology. However, as noted *supra*, it is assumed that on this motion such use is being made.  The issue is Stani's right to do so.

[13]  That is so, even though Edward Shorin, who drafted the two 1980 agreements, was "not an attorney."  It is not clear which party required that disclaimer to be inserted in the Stipulation of Agreed Facts.  However, Edward Shorin was an experienced executive in the chewing gum business, and neither he nor the company for which he acted may be insulated from the substantive law that governs those actions.  The risks born by a layman acting as his own attorney are well known.

[14]  If Topps's interpretation of the contracts between the parties was correct, the factual issue of Stani's continued use of Topps technology would have to be resolved by a trial.

35.[15] The withholding by Topps from Stani of the Bazooka Superconcentrate formula is arguably inconsistent with the proposition that the 1980 Escrow Agreement should be read, in accordance with trademark law, to allow Stani to use the technology related to those trademarks in order to avoid the prohibited transfer of a trademark "in gross." However, Topps's breach of contract claim embraces *any* post-1996 use by Stani of *all* Topps technology relating to *any* trademark transferred by the Escrow Agreement. So broad a breach of contract claim implicates the principles of trademark law discussed in this subsection.

## 2. Principles of Contract Law

Quite apart from these considerations rooted in trademark law, the 1980 Amended License Agreement and the 1980 Escrow Agreement, read together, support Stani's interpretation of the contracts and are inconsistent with that of Topps. There is, of course, no question that the parties intended the two agreements to be read together. As previously noted, the Escrow Agreement provided that the Topps trademarks would not be delivered to Stanislavsky if Stani "has defaulted in the performance of any of its obligations under the agreement between STANI and Topps dated May 3, 1976, as amended and restated" by the 1980 Amended License Agreement. Thus the 1980 Escrow Agreement and the 1980 Amended License Agreement are each vital elements of the parties' overall contractual scheme; they are joined at the hip; or, to vary the metaphor, they form the two bookends for the parties' rights and obligations.

Topps contends that the 1980 Amended License Agreement licensed Stani to use the Topps

---

[15] "H&R" is a reference to Haarman & Riemer, an Argentinian flavor manufacturer. "Reverse engineering" is a process by which "[y]ou take something that is finished and you start with the finished and go back and see step-by-step in reverse how it might have been produced." Kearns deposition, quoted by counsel for Topps in ¶ 34 of his affidavit. This reverse engineering claim, which forms a part of Topps's broader tort claim for wrongful misappropriation of trade secrets, survives Stani's present motion for partial summary judgment. *See* Part III.D., *infra*.

24

Technology, and that license expired on April 30, 1996, so that any use by Stani of Topps Technology after that date breached the Amended License Agreement.

Stani contends that while the Amended License Agreement licensed Stani to use the Topps trademarks until the expiration date, with respect to Topps Technology "[t]his was not an agreement to 'license' Topps' know-how, or to loan or rent it. It was a promise to 'supply' technology." Main Brief at 6. Expanding upon that concept, counsel for Stani said at oral argument that ¶ 7 of the Amended License Agreement "plainly is a grant and supply of the technology incidental to the trademark licenses." Tr. 13. In Stani's view, the 1980 Amended License Agreement's provisions meant that "[w]hen the relationship ended, Stani was not obligated to forget what it had learned, but it would no longer have future access to Topps' 'expertise' or its assistance or trademarks." Main Brief at 8.[16] Stani says that "[w]hat was valuable to Stani was Topps' promise to keep Stani up to date -- to 'continue supplying' technology"; and, when that responsibility on the part of Topps ended in April 1996, "if Stani wanted to keep itself abreast of new gum-making techniques after that, it would have to do so on its own (as it did)." *Id.* At the same time, Stani's payments of license fees to Topps ceased.

I conclude that Topps's interpretation of the contracts and the intent of the parties is the correct one. In reaching that conclusion, particular attention must be paid to the definition of Topps Technology in the Amended License Agreement itself. The broad and expansive language of that agreement recites the parties' intention that Topps Technology included all manner of Topps methods, expertise, and assistance in the gum-making enterprise. Had the Amended License Agreement been intended to license so all-inclusive a concept of technology only until the expiration of the agreement

---

[16] As we have seen in text, Stani's future access to the Topps trademarks was assured by the Escrow Agreement, executed simultaneously with the 1980 Amended License Agreement.

on April 30, 1996, it would seem to be designed to put Stani out of business on that expiration date. At the very least, Stani would need to start over entirely in the gum business, with new plants, new methods, new processes, and all the technical components involved in the making of chewing gum.

But this could not have been what the parties intended when entering into the 1980 Amended License Agreement, particularly when the terms of that agreement are read together with and in light of the contemporaneously executed Escrow Agreement. The parties knew when they signed the Amended License Agreement that Stani would hold right and title in the Topps trademarks when that agreement expired in 1996. Both parties must have anticipated that Stani, in continuing the manufacture and sale of, for example, Bazooka gum, would continue to utilize at least some of the "specialized knowledge and experience" it had acquired from Topps over the course of a 39-year relationship (1957 to 1996), particularly when the term "Topps Technology" included such elements as labor and equipment standards, production planning techniques, factory facility design and layout, promotional and advertising techniques, marketing techniques, and sales force management techniques. In fact, the definition of Topps Technology, after listing in detail myriad examples of "manufacturing technology" and "marketing technology", goes on to include a catch-all provision of "all other elements of TOPPS' knowledge and experience in the confectionery industry applicable to Licensed Products currently being produced by TOPPS or future products produced by TOPPS." This definition is entirely inconsistent with a license of limited duration, particularly when coupled with the certain knowledge of both parties that there would be no renewal of the Amended License Agreement and that Stani had purchased trademarks in order to continue manufacturing and selling chewing gum products when that agreement expired in 1996. The definition of Topps Technology is instead consistent with Stani's reading of the Amended License Agreement: that Topps licensed

26

the right to manufacture and sell Topps products, "Licensed Products." Since these products are only identifiable to the extent that they are manufactured "employing Topps Technology", the more inclusive the definition of Topps Technology, the more certain it would be that all Topps products would constitute Licensed Products under the agreement. If, as Topps now contends, the parties intended in the 1980 Amended License Agreement to license Stani to use Topps Technology only until 1996 and requiring Stani thereafter to cease all use of that broadly defined know-how, then that agreement should have contained language expressly limiting Stani's ability to use the technology.

When the parties intended in the 1980 Amended License Agreement to cut off Stani's right to use Topps Technology, they knew how to say it. ¶ 25 of the Amended License Agreement takes great pains to lay out Stani's obligations upon the *termination* of the agreement by Topps. While a provision in the contract, ¶ 6, separately addresses the agreement's *expiration* on April 30, 1996, that provision imposes no similar obligations and limitations on Stani. Significantly, ¶ 25(b) provides that in the event of termination "Stani will not: (I) have any further right or claim to any of the material provided by TOPPS in accordance with this Agreement…(ii) have any further right to use any of the TOPPS Trademarks or the TOPPS Technology." ¶ 6 contains no similar or comparable language cutting off or limiting Stani's use of Topps Technology if the agreement expires by its own terms (as in fact it did). That omission is entirely understandable, given the provisions of the simultaneously executed Escrow Agreement. ¶ 25(b)(ii) of the Amended License Agreement is consistent with the Escrow Agreement, which provides that legal title to the Topps trademarks will not transfer to Stani if Stani defaults in performance of the license agreement. The intent of the parties to be divined from these two agreements is that if Stani did not default under the Amended License Agreement, that agreement expired of its own terms in April 1996, and the Topps trademarks were transferred to

27

Arnoldo Stanislavsky in May 1996, Stani then owned and could manufacture and sell gum under the Topps trademarks and, in doing so, was not required to cease using, or by some feat of brainwashing to unlearn, the Topps Technology with which Stani had become familiar during the preceding 39 years.

Further indications of the parties' intent may be gleaned by contrasting the 1976 License Agreement with the 1980 Amended License Agreement. The 1980 agreement is titled the "Amended and Restated License Agreement" because it reflects amendments to the 1976 License Agreement, which itself continued the parties' pre-existing business and licensing relationship. The changes made to the 1976 License Agreement further support the conclusion that the parties' structured the 1980 Agreement to provide for 16 years of licensing, royalty payments, and information transfer, and with the expectation that thereafter Stani would continue to sell gum in Argentina under the Topps trademarks utilizing at least some portion of Topps Technology, as that term is defined by the License Agreement. Changes made to the 1976 License Agreement affected ¶¶ 2, 6, 24, and 25. Tr. at 38.

¶ 2(a) of the 1976 agreement states: "TOPPS hereby grants to STANI: (a) the exclusive non-assignable right and license to manufacture and sell during the continuance of this Agreement Licensed Products within the Territory, utilizing TOPPS Technology..." The 1980 Agreement amends the 1976 Agreement by deleting the words "utilizing Topps technology." The definition of Licensed Products remained the same in both agreements.

In the 1976 Agreement, ¶ 6 governs Stani's option to renew the term of the agreement for an additional ten year period. The contract was designed to govern the parties' relationship for ten years, with the possibility of renewal at Stani's sole option. Therefore the 1976 Agreement states that it "shall continue for a period of 10 years." In the 1980 Agreement, ¶ 6 is amended to provide for the

28

expiration of the agreement on a date certain. Rather than a ten year period followed by Stani's option to continue for another ten year period (until 1996), ¶ 6 of the 1980 Agreement provides that the Agreement will be valid for one 16 year period (until 1996), and therefore "shall expire on the 30th day of April, 1996." The significance of this change is that the duration of the agreement is made certain—extending it to the longer of the two options available under the 1976 Agreement. It was clear, however, that in 1996 the agreement would come to an end.

In conjunction with the 1980 Agreement's extension of the contract, a further amendment limited the circumstances under which the contract might be terminated. ¶ 24 of both agreements addresses the parties' termination rights. In the 1976 Agreement, Stani and Topps were granted identical termination rights. Each party could terminate the agreement if the other party entered into liquidation proceedings or receivership, or defaulted on essential conditions of the agreement. ¶ 24 was changed in the 1980 Agreement to curtail Stani's right to terminate. Under the terms of the 1980 Agreement, Stani could terminate only if a fiduciary successor to Topps fails to affirm the agreement or fails to perform under the agreement. Topps' right of termination remains unchanged by the 1980 Agreement. In the event that Topps or its successor or assign defaults, the agreement would "continue in full force and effect" pursuant to the express language of ¶ 26(b) of the 1980 Agreement. Stani's only relief would be that it could reduce its license fee payments to Topps by 50% for as long as the default was continuing. The limitation of Stani's termination right reinforces the outcome accomplished by the extension of the contract: Topps was able to rely upon 16 years of continuing royalty fees from Stani and was assured that the agreement would remain in force as long as Topps remained out of proceedings for winding up, liquidation, or reorganization.

The differences in the termination provisions of the 1976 and 1980 License Agreements are

29

also revelatory of the parties' intent when they executed the two 1980 agreements. ¶ 25 of the 1976 Agreement placed equivalent obligations on both Topps and Stani, "[u]pon the termination of this Agreement" to return materials to the other party if so requested, and to "execute and deliver any written instrument being necessary or desirable by the other party to place the parties in the position they occupied prior to the execution of this Agreement." ¶ 27 of the 1976 Agreement provided that Stani would have no further right to use the Topps trademarks and technology "[a]fter the termination of this Agreement," which under ¶¶ 24 and 25 of that agreement could be instigated by either Topps or Stani. In ¶ 25 of the 1980 Agreement, the prohibition of further use by Stani of Topps trademarks and technology is triggered only by termination of the contract by Topps, which the parties have stipulated did not occur. There is no provision in ¶ 6 of the 1980 Agreement that Stani's right to use the Topps trademarks and technology would cease upon expiration of the contract on April 30, 1996. On this motion, Topps asks me to read such a prohibition in ¶ 6 by implication. I decline to do so, because (1) the provisions for termination show that Topps knew how to draft language prohibiting Stani's future use of Topps Technology and did not include such language in ¶ 6 dealing with expiration; and (2), perhaps more importantly, and for the reasons previously stated, to imply such a prohibition in ¶ 6 of the 1980 Amended License Agreement would be entirely inconsistent with the provisions of the 1980 Escrow Agreement that in 1996 transferred the Topps trademarks to Stanislavsky.

I recognize that ¶ 7 of the 1980 Amended License Agreement provides that "[t]he TOPPS trademarks and the TOPPS technology shall at all times remain the exclusive property of TOPPS or its assigns and the rights hereby granted to Stani *shall be by way of license* or, if required by trademark regulations within the Territory, by way of registered user rights." Topps reads the

30

emphasized phrase together with the provision in ¶ 6 that "*the license granted* in clause 2 of this Agreement shall expire on the 30ᵗʰ day of April, 1996," in support of its contentions that Topps licensed use of Topps Technology to Stani and that license expired in April 1996. The argument has a surface plausibility, but it disregards the effect of the 1980 Escrow Agreement and the previously noted necessity of reading the two agreements together. The "by way of license" phrase in ¶ 7 of the 1980 agreement was taken from the identically worded ¶ 3 of the 1976 License Agreement. In 1976, a license agreement was the only contract between the parties; they had not yet agreed (as they did in the 1980 Escrow Agreement) that at a designated future date Arnoldo Stanislavsky would become the legal owner of the Topps trademarks and technology. That Escrow Agreement is fatally inconsistent with Topps's broad claim that Topps's post-1996 use of *any* aspect of Topps technology breached the 1980 Amended License Agreement.[17]

For the foregoing reasons, I hold that any use by Stani after 1996 of Topps Technology did not breach any contract between Topps and Stani.

## D. Wrongful Misappropriation of Trade Secrets

Stani contends that if Topps's claim for breach of contract fails, its claim for wrongful misappropriation falls with it. I agree.

Counsel for Topps remind me that in an earlier opinion resolving Stani's prior summary judgment, I said in a footnote that "Topps' claim for misappropriation of trade secrets is an independent tort and is not grounded solely in the contractual relationship between Stani and Topps,"

---

[17] I reiterate that for purposes of Stani's motion for partial summary judgment, this opinion assumes the post-1996 use of Topps technology which Stani denies, and considers only whether such assumed use constituted a breach of contract. The agreed fact that Topps did not give Stani the Bazooka Superconcentrate formula does not alter the contractual interpretation reached in this subsection, for reasons comparable to those expressed in connection with the effect of trademark law discussed in the last paragraph of Part III.C.1., *supra*.

31

and that "[e]ven in the absence of a contract, the misuse of a trade secret obtained within a confidential relationship may give rise to an independent tort claim for misappropriation." *Topps I*, 380 F.Supp.2d at 266 n. 24. However, the record at the time *Topps I* was decided contained no reference to the 1980 Escrow Agreement, its effect was not debated in the briefs, and the full dimensions of the contractual relationship between the parties was not before the Court. Now they are.

"To succeed on a claim for trade secret misappropriation under New York law, a plaintiff must establish '(1) that it possessed a trade secret, and (2) that the defendants used that secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.'" *LinkCo. v. Fujitsu*, 230 F.Supp.2d 492, 497-98 (S.D.N.Y. 2002) (citing and quoting *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)). Both elements must appear. Given the contractual relationship between Topps and Stani, as revealed by reading the 1980 Amended License Agreement together with the 1980 Escrow Agreement, as previously discussed, I conclude without difficulty that Topps cannot show any of the three factual scenarios that would satisfy the second element of a claim for wrongful trade secret misappropriation by Stani.

The only exception to this conclusion is a claim Topps asserts that Stani engaged in that process known as "reverse engineering." Reverse engineering occurs when the misappropriating party obtains a finished product and subjects it to engineering intended to take the product apart, peel away the layers of its development, and arrive at last at the Rosetta Stone of the trade secret which created the product. Stani acknowledges that a reverse engineering claim does not fall within the thrust of its contract-based misappropriation defense, but asserts that the record shows Topps cannot prove the claim and Stani is entitled to summary judgment on that ground. I conclude, however, that

there are factual issues with respect to Topps's reverse engineering claim that preclude a summary disposition.

## IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

1. Stani's motion for partial summary judgment is granted in part and denied in part.

2. Topps's claims for breach of contract are dismissed.

3. Topps's claims for wrongful misappropriation of trade secrets are dismissed, with the sole exception of a claim for misappropriation by means of reverse engineering.

4. The trial of this action will consist of (a) Topps's claim for wrongful misappropriation by mean of reverse engineering, and (b) Topps's claims for fraudulent inducement arising out of the 1985 agreement between the parties.

5. The Court will set a trial date in a subsequent Order.

It is SO ORDERED.

Dated: New York, New York
August 31, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

33